## H. B. TERRELL, COMPTROLLER, v. W. C. MIDDLETON.

### Decided February 20—March 28, 1916.

**1.—Governor—Compensation—Appropriations—Constitutional Law.**

Injunction having been granted forbidding the Comptroller to issue (against a deficiency declared by the Governor in an appropriation for water, fuel, lights, etc., for the Governor's mansion) warrants for the payment of claims for groceries, provisions, fruits, fuel, etc., and such judgment having been affirmed, writ of error is refused thereon without written opinion for the court.

**2.—Same—Concurring Opinion.**

Mr. Justice Hawkins, concurring, holds:

1. A taxpaying citizen may maintain suit to restrain a State officer from unconstitutional acts calling for the illegal disbursement of State funds.

2. The officer, in so doing, is not acting for the State, and the suit to restrain him is not one against the State.

3. The District Court had jurisdiction to grant such injunction.

4. The recognition by the Legislature of such claims as valid is not binding on the courts and will not deter them from holding such appropriation unconstitutional and void.

5. The Constitution of Texas does not permit the Legislature to appropriate money from the State treasury for the purchase of such articles for the Governor in addition to the compensation allowed him—"an annual salary of $4000.00 and no more." Const., sec. 5, art. 4; sec. 6, art. 16; sec. 50, art. 3.

6. Such items of expense do not come within the exceptions of sec. 49, art. 3, of the Constitution. (a) The "existing debt" for payment of which that section permitted debt to be created on behalf of the State meant such as existed when the Constitution was adopted. (b) They were not existing debts because repugnant to sec. 5, art. 4 of the Constitution, limiting the Governor's compensation, and to sec. 1, art. 2, sec. 1, art. 3, and other constitutional provisions rendering ineffective the attempted creation of such debt by the Governor under art. 4342, Revised Statutes.

7. The expression "etc." is not sufficiently specific of the purpose of an appropriation within the meaning of sec. 6, art. 8, of the Constitution; nor did an appropriation for the "Governor's Mansion" authorize a deficiency appropriation for groceries, etc., for the Governor's use, this not being an expenditure for the "mansion."

8. Custom, usage, and executive and legislative approval can not justify palpable violations of constitutional restrictions.

9. No supposed equity in a claim justifies its recognition in defiance of a plain provision of the Constitution.

10. The creation of a deficiency allowance could only be based on the exhaustion of an appropriation already made by the Legislature; and the appropriation for "groceries, fuel, etc." on which this deficiency was sought to be based was not valid, because each of the purposes for which it was made was unlawful under sec. 5, art. 4, of the Constitution.

11. Article 4342, Revised Statutes, is invalid as violative of sec. 6, art. 8, of the Constitution forbidding money to be drawn from the Treasury except in pursuance of specific appropriation made by law, since it attempts to confer on the Governor broad power to create debts against the State, which it must then pay or repudiate. (Pp. 16-39.)

ON MOTION FOR REHEARING.

**3.—Same—Dissenting Opinion.**

Mr. Justice Yantis, dissenting from an order of the Court overruling a motion for rehearing, is of opinion that:

1. Sec. 5, art. 4, of the Constitution limits the Governor's salary of $4000.00, but does not forbid the allowance of perquisites in addition by the Legislature; nor does the provision giving him the use of the "mansion, fixtures and furniture" exclude the power to allow additional perquisites of the office.

2. Sec. 48, art. 5, of the Constitution, by authorizing the Legislature to levy taxes "to raise revenue sufficient for the economical administration of the government," and to provide for the payment of "all officers, agents and employes of the State government and all incidental expenses connected therewith," directly authorizes such appropriations as the Legislature, in its discretion, considers necessary for those purposes.

3. Courts have no power to inquire into or revise the action of the Legislature in a matter entrusted to its discretion. The action of the Legislature determines, as matter of fact, that the items appropriated were incidental expenses of the Governor, or connected with the State government.

4. Courts can not inquire into the purpose, design, or motive of the Legislature, nor pronounce the appropriation unlawful, because deemed to have been made with the purpose of increasing the Governor's salary beyond the constitutional limit.

5. The action of previous Legislatures in making similar appropriations is a legislative construction of sec. 5, art. 4, which should be followed when the question is doubtful. (Pp. 39-49.)

**4.—Same—Concurring Opinion.**

Mr. Justice Hawkins, concurring with the Chief Justice in overruling the motion for rehearing, is of opinion that:

Sec. 48, art. 3, of the Constitution, being general and relating primarily to raising revenues, is subject to the specific limitations placed on the Governor's compensation by sec. 5, art. 4, and sec. 44, art. 3. Also that none of the appropriations here in question fall under sec. 48, art. 3, none being incidental to the Governor's official duties. (Pp. 49-51.)

Error to the Court of Civil Appeals for the Fourth District in an appeal from Travis County.

*Pat M. Neff* and *White, Cartledge & Wilcox,* for Petitioner Terrell.— This being a suit to restrain the alleged invasion of the rights and interests of the public generally, and no injury to the plaintiff peculiar to himself being alleged, it could only be brought and maintained by the lawfully constituted representatives and guardians of the public interest and welfare. City of San Antonio v. Strumberg, 70 Texas, 366; Gothard v. Riley, 14 Texas, 461; Chisholm v. Adams, 71 Texas, 678; Lewright v. Love, 95 Texas, 157; Caruthers v. Harnett, 67 Texas, 127; High on Injunctions, 3d ed., vol. 1, sec. 762, p. 582.

This being a suit for injunction against the Comptroller of the State of Texas to restrain the issuance by him of certain warrants to pay certain debts of the State which had been duly and regularly provided for by deficiency appropriation, as provided for by the Constitution and statutory laws of the State, the District Court had no jurisdiction of same. Constitution of Texas, art. 2, sec. 1; McKenzie v. Baker, 88 Texas, 677; Messner v. Giddings, 65 Texas, 301; Bledsoe v. Rail-

way Co., 40 Texas, 564; Stevenson v. Colgan, 91 Cal., 649, 14 L. R. A., 459.

The legislative department of the government having power under the Constitution to appropriate public funds for public purposes, and it having determined in its discretion that the various items to enjoin the payment of which this suit was instituted were for public purposes and made appropriations therefor, the judicial department of the government, being a co-ordinate branch, is inhibited by the Constitution from questioning or revising such discretion. Art. 2, sec. 1, Constitution of Texas; art. 4, sec. 1, Constitution of Texas; March v. State, 44 Texas, 64; Martin v. State, 21 Texas Crim., 2; Weaver v. Scurry County, 28 S. W., 836; Russ v. Commonwealth, 1 L. R. A. (N. S.), 409.

The Constitution authorizes the Legislature to create a debt "to pay an existing debt," and to levy taxes "for public purposes," and "for the payment . . . of all officers, agents and employes of the State government and all incidental expenses connected therewith"; and it appearing from the uncontradicted testimony that the items, bills and accounts set forth in the plaintiff's petition were existing debts against the State, and were incidental expenses connected with the officers, agents and employes of the State government, one appropriation to pay the same was authorized under the Constitution and statutory laws of the State, and the discretionary action of the Legislature in making such appropriation is not subject to judicial review. Constitution of Texas, sec. 3, art. 8, sec. 49, art. 3, sec. 48, art. 3, sec. 1, art. 2, sec. 1, art. 4; Cooley on Constitutional Law, p. 189; Stevenson v. Colgan, 14 L. R. A., 459, 91 Cal., 649.

The evidence conclusively shows that the appropriations in question were made to pay incidental expenses connected with upkeep of the Governor's mansion and grounds, he being an officer of the government, that they were made for public purposes and not for the purpose of increasing the salary of the Governor. Const., sec. 48, art. 3; Russ v. Commonwealth, 1 L. R. A. (N. S.), 409; State v. Sheldon, 111 N. W., 372.

*John W. Hornsby,* for defendant in error Middleton.

MR. JUSTICE HAWKINS, concurring in the refusal of writ of error by the court, filed the following opinion:

By a mere order, and without any written opinion, on January 10, 1917, the Supreme Court refused the application of the Comptroller of Public Accounts for a writ of error in this case. In that order I concurred; but therein I made a notation of my intention to prepare and file a statement of my own views on the law of this case.

What is the legal effect of an order of the Supreme Court refusing a writ of error? Upon that point, and even among lawyers, there is quite a divergence of opinion. The correct answer depends, ordinarily,

upon whether, in the particular case, the essential questions of law have been fully presented in the application for writ of error.

Such answer is, therefore, twofold, and it is as follows:

(1) If the essential questions have been duly preserved and presented through all the courts, refusal of the writ of error means, ordinarily, that, in the opinion of the Supreme Court, the decision made and the judgment entered by the Court of Civil Appeals are, substantially, sound and correct, and, therefore, should not be disturbed.

But, as a matter of fact, it frequently happens, in such cases, that the order refusing the writ really is based upon some ground entirely different from those stated in the opinion of the Court of Civil Appeals as the basis of its decision and judgment.

Concerning cases falling within this first class, the Supreme Court, through Judge Gaines, said:

"In rejecting an application for a writ of error, we approve the result of the case as determined by the Court of Civil Appeals, but do not necessarily adopt the opinion." Fleming v. Texas Loan Agency, 87 Texas, 238, 26 L. R. A., 250, 27 S. W., 126.

To the same effect is the following, also from this court, through Chief Justice Stayton, in an earlier case:

"When application for writ of error, showing a case in which this court has jurisdiction, is made, all the questions presented by it are carefully considered, under the light of such arguments as may be filed; and when in such cases an application is refused, this is in effect a decision by this court that the decision of the Court of Civil Appeals is correct in its result, and ordinarily opinions in writing are not given in overruling such an application, even though we may not concur in all the reasoning through which the conclusion of the court is reached." Brackenridge v. Cobb, 85 Texas, 448, 21 S. W., 1034.

(2) But, on the contrary, if, although the decision and judgment of the Court of Civil Appeals are plainly erroneous, the applicant for the writ of error is not in position to complain—as, for instance, where the point of error is not raised in the application to the Supreme Court for a writ of error, or was not presented to the Court of Civil Appeals in a motion for a rehearing as required by Rule 1 (c)—refusal of the writ means, ordinarily, no more than that such point of error has been waived by the applicant, and, therefore, can not be considered further by the Supreme Court.

The truth is that in no instance does a refusal by the Supreme Court of a writ of error necessarily or conclusively carry an approval by that court of the opinion of the Court of Civil Appeals, or even of any one or more of the grounds or reasons given in its opinion in support of its decision and judgment; and, in numerous instances, refusal of the writ of error results from failure of counsel to present, at all, to the Supreme Court, or to preserve, bring up and present there in even substantial accordance with established rules of practice, some one or more vital and controlling issues, upon which, but for such failure, the

Supreme Court, doubtless, would grant the writ of error, and ultimately, upon submission of the cause, reverse the decision and judgment of the Court of Civil Appeals.

Consequently, there being in said order refusing the writ of error in this case nothing whatever stating or indicating the cause, or reasons or reason, which induced the Supreme Court to refuse the writ, said order of refusal, upon its face, and unless read in connection with the application, which does not go into our court reports, amounts to nothing more than a peremptory refusal, for some good reasons or reason, not indicated by the Supreme Court, to disturb the decision and judgment of the Court of Civil Appeals; and such reason, presumably, at least, may involve nothing more serious than some failure upon the part of counsel for the applicant to comply, substantially, with some rule of practice in the courts.

Furthermore, from what has been said above, it follows that even when said order refusing the writ of error in this case is read in connection with, and in the light of, the entire application for the writ, and the briefs of both parties, and the record in this case, and the opinion of the Court of Civil Appeals, the utmost legal effect of such order or refusal of said writ is to declare that, in the unanimous opinion of the Supreme Court, there is at least one good and sufficient legal reason, whether stated by the Court of Civil Appeals in its opinion or not, upon which the decision and judgment of the Court of Civil Appeals should be assumed to rest, and that, consequently, said decision and judgment should be left undisturbed.

Unquestionably said order of the Supreme Court refusing the writ of error in this case leaves in full and binding force and effect the decision and judgment of the Court of Civil Appeals perpetuating the injunction against the payment of all claims against the State which are involved in this appeal; but it is, likewise, absolutely certain that in no reasonable view of the matter can said order of refusal by the Supreme Court in this case fairly be said to indicate approval of the opinion of the Court of Civil Appeals, as a whole, or of any particular ground or reason set forth therein in support of said decision and judgment of that court, or to indicate that any particular claim against the State involved in this appeal is obnoxious to any particular section of the Constitution of Texas, or to indicate whether the hereinafter quoted statute, article 4342, which purports to authorize the Governor to allow and approve "deficiencies," is, in whole or in part, valid or unconstitutional.

It is too plain to be denied that said order refusing the writ of error in this case utterly and wholly fails to indicate the opinion or views of the Supreme Court, or of any member thereof, concerning the validity of all or any part of article 4342, or concerning the legal effect of any particular section of said Constitution upon any of said claims against the State.

In short, the action of the Supreme Court, and the only order made

by it, leaves every material issue in this case *in nubibus,* in so far as the opinion and views of this court of last resort, and of its members, are concerned. With that, for my own part, I can not rest content.

The record, briefs, and printed arguments in this case, and its public history, alike establish the facts that while the primary purpose of this suit was to restrain, by injunction, the issuance of State Treasury warrants in final payment of certain claims against the State, the ultimate, and broader, and more enduring purpose of the action was to obtain from the courts, including this court of last resort, a definite opinion disclosing and declaring the real bearing and legal effect upon items of expense such as those involved in this case, of, first, not merely *some,* but *all* applicable provisions of the Constitution of Texas, and, second, the provisions of Rev. Stats., art. 4342, relating to the "allowance" of "deficiency appropriations," and payment thereunder; and that opinion was sought, with reference to, (a) ordinary biennial appropriations, and (b) "deficiency allowances" and "deficiency appropriations."

A careful consideration of the issues presented, and of the opinion of the Court of Civil Appeals for the Fourth Supreme Judicial District, by Chief Justice Fly, 187 S. W., 367, rendered June 14, 1916, has impressed very strongly upon my mind these thoughts:

First. The decision of the Court of Civil Appeals perpetuating the injunction granted by the District Court, restraining the issuance of State Treasury warrants for actual payment by the State of each and all of the items of expense which are involved in this appeal, unquestionably is sound, and said opinion of Judge Fly (excepting, possibly, one or two remarks which are unimportant in so far as the decision of this case is concerned), constitutes an able and unanswerable exposition of the law of this case, as far as said opinion goes; but it does not fully cover the case as I view it.

Second. Sound in principle and well settled by decisions of this court, and of other courts, is the proposition that the unconstitutionality of an appropriation bill or other statute need not be pleaded, such question being inherent; and, as a corollary, when such question becomes material in a case before the court, it is the duty of that court to declare such appropriation bill or other statute unconstitutional, in whole or in part, as the case may be, whenever it discovers such unconstitutionality, whether the same has been pleaded or not; and that, of course, involves and applies to each applicable provision of the Constitution. Thompson v. Houston, 31 Texas, 610; Furman v. Nichol, 8 Wall., 44, 19 L. Ed., 370; Townes' Texas Pleading, 2nd ed., p. 397.

Third. This is a pioneer case. The questions involved in this appeal may affect, very materially, future financial operations of our State government, involving the expenditure, from year to year, of considerable sums of money from the State Treasury, derived from taxation, some such expenditures to be made out of biennial "general

appropriations," and some through "deficiency allowances" under Rev. Stats., art. 4342, seq., to be paid out of some "deficiency appropriation" made in a lump sum, before, or to be made after, the "approval" by the Governor of such "deficiency allowance."

Consequently, a full expression by the appellate courts upon each of the questions of law raised in this appeal might prove to be of material assistance to the co-ordinate branches of the government, while failure to make such expression upon some branch of the case as presented by the appeal, or upon some applicable section of our Constitution, even though not relied upon by either party to the suit, might be misunderstood or misconstrued as holding, by implication at least, that some certain sound contention made in support of the prayer for injunction is without merit, or that such section of said Constitution does not inhibit such expenditures.

Under the circumstances of the case, and in accordance with the general practice of appellate courts in other States, and occasional but long established precedents in this court in cases of far less importance than this case, it seems to me to be clear: (1) that all questions of law which are involved in this appeal should be both considered by the appellate courts and passed upon, explicitly, definitely and expressly, in some written opinion; and (2) that the Supreme Court, as the court of last resort, should carefully ramify the whole subject, and make, in some form or fashion, by express adoption of the law of the case as set forth in the opinion of the Court of Civil Appeals, or otherwise, a plain and definite statement of its own views and opinion upon every issue in the case, thereby setting the entire matter permanently at rest. Why not?

It is true that, in cases involving two or more separately decisive issues, appellate courts frequently restrict the decision to only one or more such issues, pretermitting discussion of others; but it seems to me that to prevent (a) the necessity of recurring appeals of the same suit, and (b) a multiplicity of suits, the better practice, even ordinarily, time permitting, is to determine, once for all, every material question of law presented upon an appeal; and especially is that better practice applicable to this case because of its intrinsic, fundamental, far-reaching and abiding importance in the transaction of the fiscal affairs of our State government.

It is true, also, as above indicated, that, generally, in refusing a writ of error, this court does not write upon the questions involved, but contents itself with a mere order of refusal, such as has been entered in this case, and such possible implied affirmance of the result, in the particular case, announced therein by the Court of Civil Appeals, and without thereby approving, in terms, or even by necessary implication, the course of reasoning followed by that court, and without implying that such decision by the Court of Civil Appeals is not sustainable upon some ground or grounds other than those stated in its opinion in the case; but that rule rests mainly upon the idea of con-

serving the time of the Supreme Court, and to that rule, and even recently, and in cases of comparatively slight importance, there have been numerous exceptions.

For the reasons stated above, this case, as it reaches the Supreme Court, is, in my estimation, of such exceptional nature as to justify, if not require, a definite expression of the 'opinion and views of this court of last resort.

Just here it may not be inappropriate to say that because of the general public importance of this case the motion of the defendant in error to "advance" action of this court upon the application for a writ of error was granted; and that since the foregoing was written plaintiff in error has filed in this court his motion for a rehearing, containing among other things, the following:

"The constitutional questions involved in this case have never before been presented to the courts of this State for determination. We have not been able to find where the precise question has come before any court. . . . The decision of the Court of Civil Appeals, in our judgment, is erroneous, but if it should be held that that decision properly disposes of the case, the questions here involved are so important that they should be decided by the court of last resort as a guide to future Legislatures. It is quite evident that the Legislature construes the Constitution as authorizing the appropriation here sought to be held void. . . . Until a decision is handed down by this court fearlessly and fairly dealing with the law questions involved, as it deals with all questions coming before it, such appropriations, no doubt, will be continuously made. The Legislature and the people at large are entitled to have the sections of the Constitution involved construed by this court and the power of the Legislature defined for their future guidance in the event this court is of the opinion that the appropriations in controversy are invalid."

Entertaining, as I do, the ideas hereinabove stated by me, and impelled by a persistent sense of duty in the premises, and pursuant to my said notation in said order of this court refusing the writ of error, but speaking strictly for myself alone, I state, below, the essential facts, and record therewith my views concerning the law of this case.

Those views will, I trust, be found to be in harmony with my long entertained views concerning the legal effect of certain provisions of our State Constitution, as indicated by my dissenting opinion, filed in the year 1914, in Dallas County v. Lively, 106 Texas, 364, 167 S. W., 219, wherein this court held that a county commissioners court legally may make an order increasing the salary of a county judge relate back to, and become operative from, a previous date.

The general appropriation bill passed by the Thirty-third Legislature, General Laws 1913, 1 S. S. S., carried, at page 113, the following items:

"MANSION AND GROUNDS.

"For Governor's Mansion, including repairs
and remodeling of Mansion, improve-
ments of grounds surrounding the Man-
sion, including repairs and improve-
ments to Mansion and grounds and the
necessary labor to care for same, to be
expended in two years..................$12,000 00

"Labor and employes at Mansion.........  1,000 00        $ 1,000 00

"Fuel, lights, water, ice, groceries and in-
cidentals ...........................  2,000 00           2,000 00

Total ...........................$15,000 00        $ 3,000 00

"The appropriations herein provided for the executive office and
Mansion grounds are to be construed as the maximum sums to be ap-
propriated to and for the several purposes named herein, and no ex-
penditures shall be made, nor shall any obligations be incurred which,
added to the actual expenditures, will exceed the amounts herein appro-
priated for either of the said purposes, except under the provisions
provided for in article 4342 of chapter 2, title 65, of the Revised Civil
Statutes of 1911."

That statute is as follows:

"All heads of departments, managers of State institutions or other
persons intrusted with the power or duty of contracting for supplies,
or in any manner pledging the credit of the State for any deficiency
that may arise under their management or control, shall, at least thirty
days before such deficiency shall occur, make out a sworn estimate of
the amount necessary to cover such deficiency until the meeting of the
next Legislature; and such estimate shall be immediately filed with
the Governor of the State, who shall thereupon carefully examine the
same and approve or disapprove the same in whole or in part. When
such deficiency claim, or any part thereof, has been so approved by
the Governor he shall endorse his approval thereon, designating the
amount and items thereof approved and the items disapproved, and
file the same with the Comptroller; and the same shall be authority
for the Comptroller to draw his deficiency warrant for so much thereof
as may be approved; but no claim, or any part thereof, shall be al-
lowed or warrants drawn therefor by the Comptroller, or paid by the
Treasurer, unless such estimate has been so approved and filed. If
there is a deficiency appropriation sufficient to meet such claim, then
a warrant shall be drawn therefor and the same shall be paid; but,
if there is no such appropriation, or if such appropriation be so ex-
hausted that it is not sufficient to pay such deficiency claim, then a
deficiency warrant shall issue therefor; and such claim shall remain
unpaid until provision be made therefor at some session of the Legis-
lature thereafter; provided, that the provisions of this section (article)

shall not apply to fees and dues for which the State may be liable under the general laws; provided further, when any injury or damage shall occur to any public property from flood, storm or any unavoidable cause, the estimate may be filed at once, but must be approved by the Governor as provided in this section (article)."

The above quoted General Appropriation Act is not germane to any issue in this case, unless and except as it may serve as a predicate for the hereinafter mentioned "deficiency allowance" which was made by the Governor on December 14, 1914, and for the hereinafter mentioned "deficiency appropriation" of $1500 which was made by the Legislature "for the year ending August 31, 1915."

To supplement said general appropriation of $2000 for "fuel, lights, water, ice, groceries and incidentals" for the year ending August 31, 1915, which, it was found, was about to become exhausted, there was made, approved by the Governor, and filed with the Comptroller, on December 14, 1914, an estimate, or "application for an approved deficiency," of $1500 for the payment of accounts against said $2000 appropriation; and all that seems to have been done substantially in compliance with the requirements of article 4342.

Thereafter, and during the fiscal year ending August 31, 1915, said entire original "general appropriation" of $2000 having been expended, the Governor who went out of office on January 19, 1915. and his successor, respectively, incurred certain expenses, as shown below, and for said items of expense, and in pursuance of the provisions of article 4342, and by reason of said "approved deficiency" of $1500, the Comptroller issued certain "deficiency warrants," which were not paid promptly because there happened to be then in the State Treasury no money which had been appropriated for the purpose of paying allowed deficiencies. Those warrants were outstanding when this suit was filed.

After issuance of said "deficiency warrants," and, apparently, in part, at least, for their protection, the Thirty-fourth Legislature, during its regular session, by "An Act to make appropriations to cover authorized deficiencies, . . . for the year ending August 31, 1915," (Acts 1915, p. 13), made a "deficiency appropriation," as follows: "For Governor's Mansion: Water, fuel, lights, etc., $1500"; and thereon the main issue in this case must turn.

That Act was approved February 12, 1915, and on that day Middleton, a citizen and taxpayer of this State, filed in the District Court of Travis County, Fifty-third Judicial District, this suit against Terrell, as Comptroller of Public Accounts, for an injunction restraining him, generally, from issuing State Treasury warrants against said "deficiency appropriation" of $1500, in final payment of claims against the State of Texas, including those for which said outstanding "deficiency warrants" had been issued.

As grounds for such injunction the taxpayer alleged that such "deficiency appropriation" was "an attempt to increase the compensation of the Governor," and, therefore, was violative of section 5 of article 4,

of the Constitution of Texas, hereinafter quoted. A temporary injunction, as prayed for, was granted, after which the action seems to have been narrowed to only the specific items of expense hereinafter enumerated.

As grounds for injunction, Middleton pleaded:

(1) That the specific items of expense complained of were not embraced by said items in said "deficiency appropriation" Act of 1915, reading, "For Governor's Mansion:  Water, fuel, lights, etc., $1500."

(2) That said items of expense were for private and individual purposes, and not for the public good, and, even if embraced by said items in said "deficiency appropriation" Act, are, nevertheless, in direct contravention of the following provisions of the Constitution of Texas:

(a) "He (meaning the Governor) shall, at stated times receive as compensation for his services an annual salary of four thousand dollars, and no more, and shall have the use and occupation of the Governor's Mansion, fixtures, and furniture." Sec. 5 of art. 4.

(b) "Taxes shall be levied and collected by general laws and for public purposes only." Sec. 3 of art. 8.

(c) "All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to have exclusive separate public emoluments, or privileges, but in consideration of public services." Sec. 3 of art. 1.

(d) "The Legislature shall provide by law for the compensation of all officers, servants, agents and public contractors, not provided for in this Constitution, but shall not grant . . . by appropriation or otherwise any amount of money out of the Treasury of the State, to any individual, on a claim, real or pretended, when the same shall not have been provided for by pre-existing law, nor employ anyone in the name of the State, unless authorized by pre-existing law." Sec. 44 of art. 3.

(e) "The Legislature shall not have the right to levy taxes or impose burdens upon the people, except to raise revenue sufficient for the economical administration of the government, in which may be included the following purposes:  . . .  The payment of all officers, agents and employes of the State government, and all incidental expenses connected therewith." Sec. 48 of art. 3.

(f) "No debt shall be created by or on behalf of the State, except to supply casual deficiencies of revenue, defend the State in war, or pay existing debt; and the debt created to supply deficiencies in the revenue shall never exceed, in the aggregate at any one time, two hundred thousand dollars." Sec. 49 of art. 3.

(g) "The Legislature shall have no power to give or lend, or to authorize the giving or lending, of the credit of the State in aid of, or to, any person, association or corporation, whether municipal or other; or to pledge the credit of the State, in any manner whatsoever, for the payment of the liabilities, present or prospective, of any individual,

association of individuals, municipal or other corporation whatsoever." Sec. 50 of art. 3.

(h) "The Legislature shall have no power to make any grant, or authorize the making of any grant, of public money to any individual, association of individuals, municipal or other corporation whatsoever." Sec. 51 of art. 3.

(i) "No appropriation for private or individual purposes shall be made." Sec. 6 of art. 16.

The Comptroller excepted to the sufficiency of Middleton's petition upon these grounds:

(a) That the action of the Legislature, in holding said indebtedness legal and in providing for payment thereof, is not subject to review by the courts.

(b) That because Middleton has no interest in this suit other than as a taxpayer in common with others similarly situated he can not maintain this action.

(c) That this suit is one against the State of Texas, which is not shown to have consented to be sued.

(d) That the suit is not within the jurisdiction of the District Court.

The Comptroller further answered, averring, among other things, in substance:

(1) That said expenses were incurred by the Governor, not for private, but for public purposes; that all commodities and things purchased, as set forth in plaintiff's petition, were included in either the furniture or the fixtures of the mansion and grounds, or for "fuel, light, water, ice, groceries, and incidentals for the Governor's mansion and grounds"; that said general appropriation of $2000 was made and exhausted, and that said "deficiency allowance" of $1500 was approved by the Governor and filed with the Comptroller, by authority of Revised Statutes, 4342, all as hereinabove stated; and that, consequently, all of the items of expense in controversy constituted valid indebtedness and legal claims against the State, and were so prior to the passage of said "deficiency appropriation" Act approved February 12, 1915, appropriating said item of $1500; that payment by the Legislature of said indebtedness is authorized by said provisions of section 49 of article 3 of our State Constitution; and that, unless restrained, he would issue State Treasury warrants for the final payment of said items of expense in controversy.

(2) That as matters of law, of custom, and of equity, the State should pay said items of expense.

Thereupon, Middleton pleaded that, if said article 4342 is to be construed as authorizing the incurring of said items of expense as debts against the State, that statute is void as contravening each of the foregoing provisions of said Constitution.

Upon the trial, which was without a jury, the District Court dissolved said temporary injunction in part and perpetuated it in part.

The items of expense as to which the temporary injunction was dissolved was as follows:

Four claims for water and light; one claim for gas heater, cooking vessels and dishes; one claim for matting, carpets, and fixtures; one claim for cleaning flues; and two claims for telephone service. As to them no appeal was taken.

The items of expense as to which the injunction was so perpetuated, and appeal taken, were as follows:

| | |
|---|---:|
| 1-16-1915—Driskill Hotel, punch | $ 76 50 |
| 1-16-1915—Driskill Hotel, chicken salad, olives, saratoga flakes, almonds and cases, coffee, mints, sugar, lettuce, waiters, cooks and helpers | 152 40 |
| 1-18-1915—Tobin's Book Store, invitations, correspondence cards, envelopes | 53 50 |
| 12-3-1914—Achilles & Co., groceries | 98 90 |
| 1-16-1915—Maerki's Bakery, groceries | 14 20 |
| 1-17-1915—Excelsior Meat Market, meats, etc. | 12 00 |
| 1-11-1915—Bryant Bros., horseshoeing | 2 50 |
| 12-1-1914—W. J. Forster, dealer in fruits and vegetables, character of articles not stated | 13 90 |
| 1-1-1915—W. J. Forster, character of articles not stated | 15 05 |
| 2-1-1915—Consumers Fuel and Ice Co., coal furnished Governor's mansion in January | 21 25 |
| 2-1-1915—W. J. Forster, "at different dates from January 18th to 30th, inclusive," character of articles not stated | 5 70 |
| Total | $465 90 |

The foregoing claims, it seems, were the only ones for which deficiency warrants had been issued against said "deficiency allowance" of $1500. Plaintiff's amended petition prayed that payment of all those claims be restrained by injunction.

From so much of said judgment of the District Court as perpetuated said injunction as to said designated items of expense the Comptroller appealed to the Court of Civil Appeals for the Third Supreme Judicial District, from which, in equalizing the dockets, the cause was transferred to the Court of Civil Appeals for the Fourth District, at San Antonio, and that court decided the case against him; whereupon, after his motion for a rehearing had been overruled, he filed said application to the Supreme Court for a writ of error, which application was overruled, as above stated.

The Court of Civil Appeals held, in substance:

(1) That a taxpaying citizen may maintain a suit to restrain a State officer from performing illegal, unauthorized and unconstitutional acts, such as issuing State Treasury warrants calling for the illegal disbursement of State funds, thereby increasing the taxpayers' burdens.

The holding was correct. City of Austin v. McCall, 95 Texas, 565, 68 S. W., 791; Crampton v. Zabriskie, 101 U. S., 609, 25 L. Ed., 1070; 3 Ann. Cas., 1014.

(2) That when a State officer acts, in such instances, without legal authority, he is not acting for or in the interests of the State, and a suit like this, against him, is not, in effect, a suit against the State.

That holding is undoubtedly sound, on principle and on authority. United States v. Lee, 106 U. S., 196, 27 L. Ed., 171; Osborn v. Bank, 9 Wheat., 738, 6 L. Ed., 204; Conley v. Daughters of the Republic, 106 Texas, 80, 151 S. W., 877. The question is treated exhaustively in decisions cited in briefs in Stephens v. Texas & P. Ry. Co., 100 Texas, 177, involving the Railway Gross Receipts Act of 1905.

(3) That the District Court has jurisdiction over a suit of this character, the action being, not in the nature of a mandamus to compel performance of public duty, but for injunction to restrain performance of an act which is inhibited by our State Constitution.

That the proposition is sound is too clear for argument, and to that effect are the decisions in previous cases. Const. of Texas, art. 5, sec. 8; Rev. Stats., art. 4643; Kaufman County v. McGaughey, 3 Texas Civ. App., 655, 21 S. W., 261; Sterrett v. Gibson, 168 S. W., 16.

(4) That even though the Legislature may have recognized the claims or expenses in question as valid claims against the State, and appropriated money with which to pay them, such legislative action is not conclusive or binding upon the courts, and will not deter them from holding such appropriation unconstitutional and void, and restraining issuance of State Treasury warrants in payment of such claims.

The contention of the Comptroller upon that point is absurd, because necessarily it rests upon the view that whenever there is a clash between a statute enacted by the Legislature and the Constitution of Texas the latter must yield to the former.

The practical effect would be to make the will of the Legislature, each member of which is required to take an oath to support the Constitution, superior to the will of the entire people as plainly expressed in their social compact.

In the exercise of powers not inhibited by the Constitution of the United States or by the Constitution of Texas our Legislature is, indeed, supreme; but its powers do not really transcend the restrictions imposed by the people themselves in the organic law of the State.

Well was it said by the Supreme Court of the United States, in the noted case of United States v. Lee, *supra:* "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it"; and, by way of application, it is pertinent to add here, that, as related to provisions of a statute conflicting therewith our State Constitution is our supreme law, which the courts are ordained to con-

strue and uphold.   Cooley, Const. Lim., 7th ed., p. 228; Leiber, Civil
Liberty and Self-government.

Consequently, whenever, in a pending case, such a clash is presented
for adjudication by the courts, their duty is plain: manifestly they
can not uphold both the invalid statute and the Constitution; they must
uphold the latter as paramount, both because it is the solemnly de-
clared will of the whole people, and because each member of the judi-
ciary has sworn to support it, even though the meager maximum of
compensation fixed therein for the Chief Executive of this great com-
monwealth may be glaringly inadequate under present conditions.

Always reluctantly, yet independently, that power has been exercised,
and that duty has been performed, by the courts of Texas, in cases too
numerous to mention here.

Indeed, upon that doctrine, as announced by the illustrious Chief
Justice Marshall, in behalf of the Supreme Court of the United States,
in Marbury v. Madison, 1 Cranch., 137, were laid the very founda-
tions of our State government; and upon that cornerstone rest, ulti-
mately, the rights and liberties of the people,—secure, let us hope, from
either inadvertent or intentional encroachments of the legislative or of
the executive department, or both combined.

(5)   That the Constitution of Texas neither authorizes nor permits
the Legislature to appropriate moneys from the State Treasury for the
purchase, for the Governor, of any of the various above enumerated
articles and things for which said "deficiency warrants" were so issued.

That is the very marrow of said decision; and from that conclusion
there is, within the entire realm of reason, no possible avenue of escape.
In support thereof Judge Fly cites three, and only three, sections of
said Constitution, towit, section 5 of article 4, section 6 of article 16,
and section 50 of article 3, *supra;* but clearly they would be enough
if there were none other of similar import and legal effect.

"Compensation," as used in said section 5, evidently was employed in
its generic sense.   For a discussion of "compensation," as employed in
said Constitution, see my dissenting opinion in Dallas County v. Lively,
*supra.*   See, also, State v. Haldeman, 163 S. W., 1020.   The declara-
tion that the "compensation" of the Governor for his services shall be
"an annual salary of four thousand dollars," clearly indicates a pur-
pose to restrict such compensation to that amount; the added clause,
"and no more," firmly rivets said meaning of the preceding declaration;
and the next following provision, "and shall have the use and occu-
pation of the Governor's mansion, fixtures, and furniture," being in
the nature of a proviso, or special exception, makes too plain for fur-
ther argument the express determination rigidly to limit legislative
power and authority to vote to the Chief Executive any additional com-
pensation or largess whatsoever.

Thereby the framers of the Constitution, and, by their votes in adopt-
ing it, the great body of the people themselves, unmistakably defined
and plainly marked the ultimate boundaries of legislative authority in

that direction; and athwart that way, hereafter, will stand said luminous opinion of Chief Justice Fly.

Reinforcing the specific provisions of said section 5 of article 4, which deal specifically with the "compensation" of the Governor, are the above quoted "limitations" of section 50 of article 3, and also the "general provisions" of section 6 of article 16, upon which, also, Judge Fly relies. Those "limitations" and also those "general provisions" relating to the powers of government certainly aid in developing the spirit and genius of our Constitution, in accord with the views herein expressed; and that is true, likewise, of each of the other foregoing quotations from that instrument.

Together they form a remarkable setting for, and lift into dazzling prominence, the sharp restrictions upon legislative authority which are mounted in said section 5 of article 4.

When so construed all of said provisions of the Constitution and all other pertinent provisions of that somewhat old-fashioned but humanly sacred document blend into one white light of harmony; whereas, if said provisions of section 5 of article 4, either by themselves or in connection with the foregoing provisions of section 49 of article 3, be construed as authorizing or even as permitting payment, from the State Treasury, of the items of expense covered by said permanent injunction, the effect is to introduce serious discord, and becloud our vision, as to the purpose, meaning and legal effect of our Constitution, as a whole, in relation to such items of expense.

(6)    That the items of expense here involved do not come within the "exceptions" of section 49 of article 3.

That holding appeals to my mind as sound. Upon that point, and hereinafter, I will state my views more fully.

(7)    That even though, ordinarily, the expression "etc.," as used in said "deficiency appropriation" Act, may be broad enough to include the items of expense here in controversy, those items of expense were not for "Governor's Mansion," and, consequently, are not within the terms of said "deficiency appropriation."

The effect of that holding, in which I concur, is to establish an added ground for said permanent injunction, without disposing of the other questions in the case. Just here I will add that I do not consider the expression "etc." *specific* within the meaning of section 6 of article 8 of said Constitution, *seq.* State v. Wallichs, Auditor, 12 Neb., 407, 11 N. W., 860.

(8)    That custom and usage, even when sanctioned by both legislative and executive approval, and however long continued can not justify or excuse palpable violations of plain and unambiguous inhibitions and restrictions set out in the Constitution of Texas.

Mere statement of that proposition establishes its correctness on principle, and abundant and eminent authorities support it. Cooley, Const. Lim., 7th ed., p. 106. The "claims" or expenses in controversy involve no "rule of property."

To the Comptroller's contention that the State should pay said "claims" or expense because "equity" so requires, it may be answered that every claimant must be presumed by the courts to have been warned, in advance, by the Constitution of this State that all such purchases and employments on the alleged credit of the State were wholly unauthorized, wrongful and illegal, and that, under its present Constitution the State will not and can not pay any such "claim" or expense.

It has long been clearly and firmly settled by numerous well considered decisions of various appellate courts of this State, including the Supreme Court, that the rules of equity which, under such circumstances, might impel an individual to pay all of said claims, justly or legally can not control the action of those "invested with the powers of government" to the extent of inducing them to ignore and disobey and defy perfectly plain and mandatory provisions of the Constitution of this State. State v. Wilson, 71 Texas, 291, 9 S. W., 155; State v. Haldeman, 163 S. W., 1020; Nichols v. State, 11 Texas Civ. App., 327, 32 S. W., 452; Ketner v. Rogan, 95 Texas, 559, 68 S. W., 774.

I come now to certain features of this case which seem to have been either overlooked or not fully developed. I allude to section 6 of article 8, and sections 49 and 44 of article 3, of our Constitution, considered separately, and in connection with each other, and also in connection with Revised Statutes, article 4342, *supra.*

Said section 6 of article 8, which seems to have been entirely overlooked in this case, and also in the enactment of article 4342, provides:

"No money shall be drawn from the Treasury but in pursuance of *specific appropriations made by law.*" As to the meaning of "specific appropriations," see Terrell v. Sparks, Treasurer, 104 Texas, 191. That term, in the singular number, as used in like article 3 of the Constitution of Nebraska, aptly was declared by the Supreme Court of that State to mean "a particular, a definite, a limited, and a precise appropriation." State v. Wallichs, Auditor, 12 Neb., 407. That court also held: "A specific appropriation is one expressly providing funds for a particular purpose." State v. Wallichs, Auditor, 15 Neb., 609, 11 N. W., 860. See. also, Stratton v. Green, 45 Cal., 149, as to the meaning of that term in a statute. "By law" plainly means by a formal "Act" of the Legislature. This will be applied to article 4342 further on.

Special attention is hereby directed to the broad and biting provisions of section 49 of article 3, *supra,* relating to the *creation* of "debts," "by or on behalf of the State," to which provision the Comptroller points as the permissive basis of legislative powers in this case.

Certainly none of said items of expense possibly can fall within any of the "exceptions" set out in section 49, unless it be the fifth, which permits the "creation" of a "debt" to pay an "existing debt." However, the precise contention of the Comptroller is, that when the Legislature actually made said "deficiency appropriation" of $1500, said "deficiency

allowance" of December 14, 1914, already had been made by the Governor, and said items of expense already had been incurred thereunder and that, consequently, said "claims," based upon said items of expense, were, *at date of said "deficiency appropriation," "*existing debts" within the meaning of section 49 of article 3, and, for that reason, were within the implied permissive right of the Legislature to appropriate money in payment thereof.

To all that, one good and sufficient answer, couched in general terms, is, that when the Legislature came to pay said claims, or items of expense, not one of them constituted a *valid "existing debt"* against the State. In support of that conclusion many good reasons may be adduced; and among them I set down the following:

(a) "Existing debt" in section 49 includes. it seems to me, *primarily,* only such debts as were in existence *when said Constitution was adopted,* and, *secondarily,* certainly nothing more than renewals of such "existing debt" and renewals of "debts" to be created in future, but falling within some of the other four *exceptions* enumerated in section 49; and the claims or items of expense here in controversy were not in any of those classes. I regret that I have not had time for tracing, historically, the meaning of "existing debt" as used in section 49.

(b) Said "claims" were repugnant to section 5 of article 4, as above shown, and to section 44 of article 3, for reasons hereinafter stated, to say nothing of any other section of said Constitution. Surely the Constitution makers did not intend, by one section, to authorize or permit payment of claims which, in practical effect, increase the Governor's compensation beyond the maximum limit fixed by another section, especially when such claims had been incurred without having been provided for by any *valid* pre-existing law, as required by still another section.

(c) The inhibition in section 49 is leveled *primarily* against the *payment* of prohibited "debts," "by or on behalf of the State,"—a fact which said contention of the Comptroller wholly overlooks or utterly disregards.

It follows that the legal effect of section 49 upon said claims or items of expense, can not be ascertained except by test *as to the dates of the attempted creation* of said claims, rather than as of the date of said "deficiency appropriation" to *pay* them.

To say that the Legislature had authority to pay said claims because, when they came to make an appropriation therefor, they were valid existing debts against the State, assumes the very point in issue, and constitutes a mere begging of the question as to whether said claims are permitted, or are inhibited, by section 49.

The "request" for said "deficiency allowance" is set out in the record of this case, and it affirmatively shows, and the fact is not denied, that such "allowance" frankly was "requested" and "approved" for the express purpose of *supplementing* said original $2000 general appropri-

ation for "fuel, lights, water, ice, groceries and incidentals," under the head of "Mansion and Grounds." Presumably, said "deficiency allowance" was to defray "claims" or expenses which were to be incurred *in future.*

The facts, as shown by the record, *supra,* are that at date of "approval" and "filing" of said "deficiency allowance," on December 14, 1914, none of said claims or items of expense, except two, had been incurred, and that said two claims had been incurred a few days prior to that date. Applying the foregoing, and testing, by section 49, just here, as at the times of their attempted *creation,* said claims or alleged "debts against the State," it becomes perfectly evident to even the simplest mind that not a single one of the items of expense involved in this appeal was "created," or incurred in payment or in renewal of, or in relation to, or with any thought of, any then "existing debt" whatsoever, whether within or without said fifth exception.

As to said two claims, this may be added: They appear to have been incurred in excess of said original $2000 appropriation, to supplement which said "deficiency allowance" of $1500 was approved by the Governor,—else, probably, they would have been paid out of said $2000—and certainly they antedated said "deficiency allowance," and, therefore, acquired no vitality from it or from article 4342, upon which the Comptroller relies: wherefore, not having been incurred under any sort or pretense of "pre-existing law," they clearly fall within condemnation of section 44 of article 3, *supra,* and for that reason, if for none other, can not legally be paid by the State; and this remains true even if article 4342, pursuant to which said other claims were incurred, should be upheld as constitutional and valid.

In determining the full legal effect of section 49 of article 3, as applied to article 4342, this inquiry becomes pertinent:

What is meant by "debts" as that word is first used in section 49? Does it embrace "current expenses" of the State government, thereby inhibiting the Legislature from pledging, *in any way,* the faith and credit of the State in payment thereof?

If so, said claims are thereby barred from payment, and article 4342 is rendered void. Taken literally, "debt" certainly does embrace "current expenses" of the State; and it must be conceded that a cardinal rule of construction is that the words of an instrument ought to be given their plain, natural, ordinary meaning, unless it is reasonably evident that they were there used in some peculiar sense; and that rule applies with special force to a State Constitution, made by the common people.

Upon the other hand, "debts," as used in section 5 of article 11 of that Constitution, relating to cities, and in section 7 of that article, relating to counties and cities, has been held, in a long line of Texas decisions, including several by the Supreme Court, not to include "current expenses" of municipalities.

The soundness of those decisions can not be doubted. There the

requirement being the creation of a "sinking fund" to secure payment of a particular obligation, the context indicates, distinctly, the peculiar sense in which "debt" is there employed, the purpose being to "limit the power of creating debts by making it proportionate to the power of taxation" (71 Texas, 770), but not carrying any inhibition against incurring liability for "current expenses," *within current revenues.* And in connection with the fact that the word in question, as there used, is of the significance above indicated, and has been so construed, stands the general rule that when a particular word recurs in an instrument it should be given the same interpretation throughout, unless there be some good reason to the contrary.

It is true that in section 49 of article 3 "debts," in the first clause, is not flanked or explained by the context, as is in article 11; but, nevertheless, its meaning in section 49 should be harmonized, as far as possible, with its meaning as it stands in article 11 and also with the provisions of section 44 of article 3, the latter plainly recognizing the power and authority of the Legislature to provide by law for the compensation of "contractors" and others. Amounts owing upon contracts, payable in money, constitute "debts," within the ordinary signification of that word. Melvin v. State, 121 Cal., 16, 53 Pac., 416. Evidently it was not the purpose of the framers of the Constitution thereby to inhibit the making of all State contracts, such, for instance, as contracts for public buildings; yet such contracts are not embraced by any of the *exceptions* set out in section 49.

Under such circumstances I am not prepared to say that "debts," in the inhibitory clause of said section 49, includes "current expenses" of the State government, thereby rendering article 4342 unconstitutional. On the contrary, I am inclined to the opposite view; in which, as applied to that statute, I am strengthened by the reflection that no court should hold a statute invalid, as violative of a specific provision of the Constitution, unless it is clearly so. I will proceed, therefore, upon the assumption that said section 49 does not prohibit the creation of debts by or on behalf of the State for current expenses of the State, to be paid by specific appropriations from the State Treasury. That leaves open, temporarily, for further consideration, the question as to the validity or invalidity of article 4342 when tested by other applicable provisions of the Constitution.

Renewed attention is here called to the fact that section 44 of article 3, *supra,* expressly declares that the Legislature shall not "grant by appropriation or otherwise, any amount of money out of the Treasury of the State, to any individual, on a claim, real or pretended, *when the same shall not have been provided for by pre-existing law,* nor employ anyone in the name of the State *unless authorized by pre-existing law.*" That seems very plain and simple. Obviously it says what it means, and means what it says. To that effect are the decisions spanning many years. State v. Wilson, 71 Texas, 291, 9 S. W., 155; Terrell v. Sparks, Treasurer, 104 Texas, 191, 135 S W., 452; State

v. Haldeman, 163 S. W., 1020, and cases therein cited. In connection with the present case they supply reading which is at once entertaining and instructive. In the Haldeman case the Supreme Court refused a writ of error, this writer being disqualified therein by reason of having been of counsel for the State.

Said provisions of section 44 will be applied to article 4342 later on.

Moreover, the requirement in section 44 that the Legislature shall provide *by law* for the "compensation of all officers . . . not provided for in this *Constitution*," when read in the light of section 5 of article 4, wherein the compensation of the Governor is precisely "provided for," impliedly inhibits the Legislature from enlarging or reducing the amount of his compensation.

Reverting, next, to article 4342, *supra,* and studying it in the light of what has been said above, it is observed that said statute expressly provides that upon approval by the Governor of a "deficiency claim," and the filing thereof, "if there is a deficiency appropriation sufficient to meet such claim, then a warrant shall be drawn therefor and the *same shall be paid,*" meaning that, in such event, such claim shall be paid forthwith, and out of the State Treasury. Necessarily that contemplates the making, from time to time, *in advance,* by the Legislature, of "deficiency appropriations" in *certain lump sums,* out of which are to be paid any and all such "claims" and items of expense as may be incurred pursuant to article 4342, under any and all "deficiency allowances" which, *thereafter,* may be approved by the Governor and filed with the Comptroller.

Probably the Legislature does not habitually make such lump sum deficiency appropriations *in advance,* for that purpose; but said statute certainly was framed upon the theory that the Legislature *may* do so; and it is, therefore, upon that basis that its constitutionality must be tested out.

However, I well remember that in at least one notable instance the Legislature did exercise its alleged power to do so, making, in that instance, such an *advance lump sum* "deficiency appropriation" to the extent of $100,000. Gen. Laws 31st Leg., 1909, chap. 5, p. 392.

Is that portion of article 4342 valid? Clearly it is not. It is plainly repugnant to section 6 of article 8 of our Constitution which requires that all appropriations from the Treasury shall be "specific."

However, that portion of article 4342 is severable from the remainder thereof, and even without such invalid portion the Legislature probably would have enacted the remaining portion of that article.

But is the remaining portion valid? Let us see.

It will be observed that said statute places no *limitation whatever,* in amount, upon the power which it attempts to confer upon the Governor to "approve" "deficiency claims" commonly known as "deficiency allowances." The evident purpose of the statute, and its inevitable legal effect, if said remaining portion thereof be valid, is to confer upon the Governor, at least when acting in conjunction with certain

individuals therein designated, full, absolute· and untrammeled power and authority to create, *upon the faith and credit of the State,* "debts" and "claims" against the State, for purposes more varied, in some respects, than those mentioned in any ordinary general appropriation Act, and in *absolutely unlimited amounts.* I regard it as too plain for argument that "claims" or "expenses" incurred under such a "deficiency allowance," as was done in this case, must be held to occupy the status of valid debts against the State, if said remaining portion of article 4342 is, indeed, constitutional· and valid.

It is part of the public history of this State that such "deficiency claims" or allowances biennially cover a very wide range, and include, in particular instances, and especially in the aggregate, large sums of money.  For illustration, I am informed that there is now pending before the present Legislature a bill to appropriate from the State Treasury largely more than a quarter of a million dollars for the pay-· ment of such "deficiency claims" or "allowances," which have been "approved" by the Governor, under article 4342, within about two years.

It is, of course, by what a statute undertakes to authorize and require rather than by what actually is done thereunder, that its constitutionality is to be tested; but its actual operation in practice sometimes serves simply to call attention to, and emphasize, its possibilities, thereby quickening comprehension as to its real legal effect, and so aiding in the determination of questions involving its validity.

The possibilities, under article 4342, if even only said remaining portion thereof as valid, are indeed startling, because thereunder, and in strict compliance with its every letter, the Governor and another belonging to any of the several classes of State officials therein designated, can incur, and pledge the faith and credit of this State for the payment of expenses, claims and "debts," for the widest range of things, and in unlimited amounts, and that, too, under circumstances which practically compel the Legislature to make, subsequently, in the most perfunctory manner, corresponding "deficiency appropriations" in payment of all such items of indebtedness, failure of the Legislature to do so constituting, in that event, nothing less than rank State repudiation.

Is all that, which undoubtedly is within the scope and meaning of Revised Statutes, article 4342, consonant with the Constitution of Texas and in accord with the spirit or even the letter of its various provisions?  I think not.  If it is, then my study of that instrument has been in vain.

I decline to charge, or to admit, or to believe, that our fathers, who drafted and adopted it, were so wanting in the fundamental elements of state craft, or that they left the State Treasury so unguarded, or that they contemplated or left legally possible such delegation by the Legislature of the power conferred upon it, *exclusively,* to pledge, appropriate and expend so large a portion, or *any* of the fruits of taxation

for the support of the State government in all its marvelous ramifications.

Surely those who made our Constitution did not contemplate that the law-making department of the government of this great commonwealth would ever, to such great extent, or even at all, undertake to pass on to others, though they be trusted and trustworthy State executive or administrative officers of high degree, such unmeasured and unbridled power and authority over public funds, thereby, and to that extent, abdicating a very important portion of its own high legislative functions, and reducing the Legislature itself, in that respect, to the rank of an amanuensis registering the will of its masters who, in advance, already have determined both the purposes and amounts of such expenditures from the State Treasury.

I do not so construe our State Constitution.

I have no doubt that the spirit, and even the literal meaning, of the declaration that "no money shall be drawn from the Treasury, but in pursuance of *specific appropriations made by law*," found in section 6 of article 8 of that instrument, especially when considered along with cognate provisions of the Constitution, is that the *Legislature* itself, rather than the Governor and another, shall, *in the first instance*, and when the matter is open and unprejudiced, and in the exercise of real and potential legislative discretion, pass its own determining judgment upon the purposes, *if any*, for which the money of all the people is to be appropriated, and also upon the amounts of such appropriations.

To say that the Constitution of Texas confides to the Legislature (including the Governor to the extent of his approving and vetoing powers), exclusive authority to incur debts against the State, and to pledge its credit in payment thereof, and to appropriate money from the State Treasury, in payment thereof, would be but commonplace.

Let the organic law speak for itself, disclosing its great purposes:

"The powers of the government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, towit: Those which are legislative to one, those which are executive to another, and those which are judicial to another; and no person or collection of persons being of one of these departments shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted." Sec. 1 of art. 2. That identical language formed the corresponding section of the Constitution of 1845, and since then the substance thereof has been preserved continuously in our various Constitutions.

The corresponding provision of the Constitution of the Republic of Texas (1836), was: "The powers of this government shall be divided into three departments, viz: legislative, executive, and judicial, which shall remain forever separate and distinct." Sec. 1, art. 3.

It will be observed that our present Constitution *expressly* prohibits the exercise by any "person or collection of persons belonging to one

department" of "any power properly attached to either of the others, except in instances herein expressly permitted." The exceptions do not include the creation of debts against the State.

"The legislative power of this State shall be vested in a Senate and House of Representatives, which together shall be styled 'The Legislature of the State of Texas.'" Sec. 1, art. 3.

"The Legislature shall pass such laws as may be necessary to carry into effect the provisions of this Constitution." Sec. 42, art. 3.

"The Legislature shall provide by law for the compensation of all officers, servants, agents and public contractors, not provided for in this Constitution." Sec. 44, art. 3.

"The Legislature shall have no power to give or lend or to authorize the giving or lending of the credit of the State in aid of, or to, any person," etc. Sec. 50, art. 3, *supra.*

This is a clear recognition of the general power and authority of the Legislature to give or lend the credit of the State, except as restricted by the Constitution.

"The Legislature shall have no power to make any grant or authorize the making of any grant of public money to." . . . Sec. 51, art. 3.

This is a clear recognition of the general power and authority of the Legislature to appropriate money from the State Treasury, except as restricted by the Constitution. See, also, section 52 of article 3, as to power to make laws conferring upon counties and cities and towns, respectively, similar authority over their respective revenues.

"The Legislature shall have no power to grant, or to authorize any county or municipal authority to grant, any extra compensation, fee or allowance to a public officer, agent, servant or contractor after service has been rendered or a contract has been entered into and performed in whole or in part; nor pay, nor authorize the payment of, any claim created against any county or municipality of the State, under any agreement or contract made without authority of law." Sec. 53 of art. 3.

"No money shall be drawn from the Treasury but in pursuance of specific appropriations made by law." Sec. 6, art. 8.

"The Legislature shall have no power to appropriate any of the public money for the establishment and maintenance of a bureau of immigration, or for any purpose of bringing immigrants to this State." Sec. 56, art. 16.

"The Legislature may, from time to time, make appropriations for preserving and perpetuating memorials of the history of Texas, by means of monuments, statutes, paintings, and documents of historical value." Sec. 39, art. 16.

"No law passed by the Legislature, except the general appropriation Act, shall take effect or go into force until ninety days after the adjournment of the session at which it was enacted, unless in case of an emergency." Sec. 39, art. 3.

The right and duty of the Governor to participate in the making of all laws, by signing or vetoing, is clear (sec. 14, art. 16); but that

very fact defines and emphasizes the limitations placed by the Constitution upon his rights and duties in regard to pledging the credit of the State and in regard to appropriations from the State Treasury in payment of debts so made.

Irresistibly the foregoing provisions of our fundamental law compel the conclusion that, subject only to limitations and restrictions set out in that instrument, in the law-making department of the State government rests the *primary,* and, as well, the *exclusive* power of determining for what purposes and in what amounts the credit of the State shall be pledged. The law-making department itself, and not a delegated dual agency, carries at its girdle the magic key which, *in practical operation and effect,* and not merely in name only, unlocks the portals of the State Treasury.

It follows that the operation of article 4342 necessarily is to disturb the delicate system of governmental "checks and balances" established by the Constitution, and to disregard the solemn restrictive provisions of section 1 of article 2 of our present Constitution.

That legislative power can not be delegated is a general rule and maxim to which all judicial minds give ready assent, certain seeming exceptions being almost as well recognized.

In applying that abstract rule to concrete cases which come before them, courts sometimes differ as to its applicability; but there is, I think, no room for two opinions upon the proposition that Revised Statutes, article 4342, involves a clearly undue delegation of legislative power and authority.

From what has been said above, if same be sound and correct (and thus far, at least, I have been unable to see or find any avenue of escape therefrom), Revised Statutes, article 4342, is wholly unconstitutional and void, and, therefore, is not a "pre-existing law" in contemplation of section 44 of article 3, *supra.*

The immediate result is that the "claims" or items of expense involved in this appeal, not having been authorized by any *valid* "pre-existing law," are themselves invalid as claims or debts against the State, and could not, legally be paid by the State, even though they were not repugnant to any other provision of the Constitution of Texas.

Certainly it can not be true, and it has not been contended in this case, that, in the absence of any *valid* and *"pre-existing law"* authorizing it, even the Governor has power or authority to incur any expense on behalf of the State, or to pledge the credit of the State in anywise to anyone for anything, great or small. State v. Wilson, 71 Texas, 302.

However, even if Revised Statutes, article 4342, is, in all respects, constitutional and valid, there is still another unanswerable reason why even such of said claims or items of expense as were created or incurred after the approval and filing of said "deficiency allowance" can not legally be paid by the State. It is this: Said *original* $2000 appropriation, whether considered as an entity or item by item, was repugnant to and inhibited by said section 5 of article 4 of our State

Constitution, in consequence of which fact said original appropriation was *void* in all its parts, and, therefore, constituted no legitimate, valid, or sufficient predicate or basis for said subsequent *purely supplementary* "deficiency allowance"; wherefore, said "deficiency allowance" itself was unauthorized by article 4342, and was utterly illegal and invalid, and constituted no legal authority whatever for the creation or payment of said claims.

Article 4342 evidentlly contemplates that any deficiency allowance thereunder must be to *supplement* some antecedent and *valid original* appropriation. Said *original* $2000 appropriation being void, there was nothing to supplement; hence article 4342 was not applicable.

That said $2000 general appropriation was void because each separate item or element thereof was repugnant to and inhibited by said section 5 of article 4 of the Constitution is unquestionably certain. Said original $2000 appropriation embraced the items "fuel, lights, water, ice, groceries and incidentals," but none other. Testing them out, separately, by the terms of section 5 of article 4, which provides that the Governor shall receive "as compensation for his services an annual salary of four thousand dollars, and no more, and shall have the use and occupation of the Governor's mansion, fixtures and furniture," it is obvious that no one such item is either "salary," or "mansion," or "fixtures," or "furniture"; consequently, each such item is void.

The whole purpose and legal effect of that section of the Constitution may be summed up in the statement that it provides and requires, in substance, that in full compensation for his official services the Governor shall have an annual salary of $4000, and the free use and occupation of the mansion and grounds, including fixtures and furniture, but *nothing else whatever*.

The never ceasing wonder to me is that anyone ever fancied that they mean anything else, less or more, or that Revised Statutes, article 4342, is a valid statute, or that the claims in controversy constitute valid debts against the State of Texas, or that, legally, they may be paid out of the State Treasury.

For all the reasons above stated the writ of error should have been denied by the Supreme Court; and, as stated, it was denied.

Concurring opinion filed February 20, 1917.

Writ of error refused.

### ON MOTION FOR REHEARING.

Mr. Justice YANTIS filed the following opinion, dissenting from the order of the court overruling the motion for rehearing.

This was an injunction suit instituted in the Fifty-third District Court of Travis County, Texas, by one W. C. Middleton, a citizen of Rains County, Texas, who sued as a citizen and taxpayer of the State to restrain H. B. Terrell, Comptroller, from issuing warrants to pay certain items for which an appropriation had been made by the Legis-

lature in favor of Governor O. B. Colquitt, to defray certain mansion expenses incurred by him while he was Governor of Texas.

The following terse statement of the case is copied from the argument of plaintiff in error:

"The Thirty-third Legislature at its First Called Session appropriated for the Governor's mansion and grounds, among other things, the following: 'Fuel, lights, water, ice, groceries and incidentals for the year ending August 31, 1914, $2000; and for the year ending August 31, 1915, $2000.' Acts, First Called Session, Thirty-third Legislature, page 113. The appropriation for the year 1915 having been exhausted, the Thirty-fourth Legislature at its First Regular Session by section 3 of the Act approved February 12, 1915, made an appropriation to cover certain deficiencies, among which was the following: 'For Governor's mansion, water, fuel, lights, etc., $1500.' Acts of the Regular Session, Thirty-fourth Legislature, page 14. There is no contention that the deficiencies for which said deficiency appropriation was made were not authorized and created in the usual and ordinary way provided by law, but the contention is made that the appropriation bills above referred to, upon their faces, show that they were made for the purpose of increasing the salary of the Governor of this State, and are in contravention of section 5, article 4, of the Constitution of this State, and are, therefore, void. It is admitted that the deficiency appropriation of $1500 was made for the purpose of paying the claims offered in evidence in this case by the defendant in error, and no contention is made that any of the claims involved in this suit were not covered by and intended to be paid out of the said $1500 deficiency appropriation. The court below found and held that the claims of the city of Austin for water and light, the claim of Voss & Koock for various kinds of dishes, the claim of C. A. Dahlich for furniture, carpets, etc., the claim of M. B. King for cleaning flues in the mansion, and the claim of the United Telephone Company and the Southwestern Telephone Company were valid claims and dissolved the injunction granted herein as to said claims and found and held that the following claims are invalid because they were for purposes not authorized by the Constitution, towit, increase in the Governor's salary: The Driskill Hotel Company's claim for chicken salad, olives, almonds, coffee, sugar, meat, lettuce, waiters, helpers, punch, etc.; Tobin's Book Store claim on account of printing invitations, etc.; Maerki's Bakery claim for bread, etc.; Excelsior Meat Market claim for meat; Bryant Brothers' claim for horseshoeing; W. J. Foster's claim for fruits, vegetables, etc.; the Consumers Fuel & Ice Company claim for ice were by the court below held to be invalid, and an injunction heretofore granted in this case was perpetuated as to such claims."

Middleton alleged in his original petition that said appropriation was illegal and void because it was an attempt to increase the compensation of the Governor of Texas, which was contrary to section 5 of

article 4 of the Constitution of the State of Texas. This article of the Constitution reads as follows:

"Section 5. Governor's Salary and Mansion.—He shall, at stated times, receive as compensation for his services an annual salary of $4000, and no more, and shall have the use and occupancy of the Governor's mansion, fixtures and furniture."

Later, by amended petition, he alleged that the appropriation was illegal because unconstitutional for the following additional reasons:

Because in violation of section 3 of article 8 of the State Constitution, which is as follows:

"Taxes shall be levied and collected by general laws and for public purposes only."

And because in violation of the following portion of section 51 of article 3 of the State Constitution:

"The Legislature shall have no power to make any grant or authorize the making of any grant of public money to any individual, association of individuals, municipal or other corporation whatsoever."

And because said appropriation is in violation of section 3 of article 1 of the State Constitution, which is as follows:

"All free men, when they form a social compact, have equal rights, and no man or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public service."

Among other defenses pleaded by Terrell, who was defendant in the District Court, and who is plaintiff in error here, in his motion to dissolve the temporary injunction, was that each item of indebtedness shows on its face to be a debt against the State created prior to said writ of injunction by the authority of article 4342 of the Revised Civil Statutes of Texas, and by the authority of the appropriation bill, passed by the Thirty-third Legislature, appropriating money for the following purposes, towit:

"Fuel, lights, water, ice, groceries, and incidentals for the Governor's mansion and grounds."

And that the Legislature of the State of Texas had prior to the issuance of the injunction passed upon the legality of said indebtedness, and that the same is not now subject to review by a co-ordinate branch of the government. Also it is contended by the plaintiff in error, Terrell, in the petition for writ of error, that the items of the indebtedness, the payment of which is sought to be restrained, were authorized by that portion of section 48, article 3, of the State Constitution, which provides that the Legislature shall have the right to levy taxes and impose burdens upon the people in the "payment of all officers, agents and employees of the State government, and all incidental expenses connected therewith"; and that the items of the indebtedness, the payment of which is sought to be restrained, were incidental expenses of this nature.

The ruling of the trial court was as indicated in the above quotation from the statement contained in the argument of the plaintiff in error.

As to some of the items, as indicated therein, the writ of injunction was granted, and as to other items, as indicated therein, the writ of injunction was denied.

Appeal was taken by Terrell, as appellant, from the judgment of the District Court to the Court of Civil Appeals. There a decision was rendered adverse to the contentions of Terrell, affirming the judgment of the District Court. 187 S. W., 367. The case was brought here on application of Terrell, the plaintiff in error, who sought to have the judgment of the Court of Civil Appeals reviewed, and its judgment reversed. This court acted upon said application for a writ of error on a prior day of the present term of this court and refused to grant the writ of error, being of the opinion that the appropriations were in violation of the Constitution. I concurred in that view. Since that action by this court a motion for a rehearing has been presented requesting that we again consider the questions. I have reinvestigated all the questions presented and have reached a different conclusion upon some of them. I now incline to the view that the appropriations were not in violation of the Constitution, for reasons which I will indicate herein, and I believe that justice will be promoted by granting the writ and submitting the case for a full hearing upon oral argument by attorneys for both sides of the controversy. Justice can not suffer by such a course, and I can see no good reason for denying to the parties a full hearing upon oral argument.

Does section 5, article 4, of the State Constitution, quoted above, which provides that the Governor shall "receive as compensation for his services an annual salary of $4000, and no more, and shall have the use and occupation of the Governor's mansion, fixtures and furniture," mean to prohibit the Legislature from appropriating at its will other perquisites than the "use and occupation of the Governor's mansion, fixtures and furniture"? and does the use of the phrase "and no more" amount to such prohibition? As I understand it, the expression "and no more" relates entirely to the Governor's salary. He shall receive "an annual salary of $4000, and no more," clearly means and no more salary. That is its plain, grammatical, unambiguous meaning. Its grammatical sense should be followed in construction unless a different meaning clearly appears by the use of the words employed. (Section 408, Lewis' Sutherland Statutory Construction.) Such grammatical meaning is clearly recognized by the petition of Middleton, which specifically alleges that said appropriation is "an attempt to increase the compensation of the Governor of Texas." It might be noticed here that not a word of evidence was introduced by Middleton to prove such ulterior purpose and motive on the part of either the Legislature which passed the appropriation, or of Governor Colquitt in using the money appropriated.

But it is argued by attorneys for Middleton that the portion of said section which provides "and shall have the use and occupation of the Governor's mansion, fixtures and furniture" is exclusive, and prohibits

the Legislature from granting to the Governor any other perquisites than the ones mentioned. This is undoubtedly the general rule. The maxim *"expressio unius est exclusio alterius"* is generally followed as a rule of construction, but like all rules it has many exceptions. One of the exceptions is that "if there is some special reason for mentioning one, and none for mentioning a second which is otherwise within the statute, the absence of any mention of the latter will not exclude it." (Section 495, Lewis' Sutherland Statutory Construction.) A special reason existed, perhaps, for mentioning the use and occupation of the Governor's mansion, fixtures and furniture, in the fact that the State owned this property, and the members of the constitutional convention wished the Governor of Texas to occupy the mansion rather than to live in private quarters; they wished him to live, not in the plain, simple residence of an humble citizen, but in the Governor's mansion, in order to live in keeping with the exalted office of Governor of a great State. No such special reason existed for the mention of other perquisites of a similar nature. As indicating that the members of the constitutional convention did not wish to exclude other perquisites, there stands out prominently in the proceedings of the convention the fact that after section 5 of article 4 of the Constitution, as it now exists, had been agreed upon, Mr. Crawford, one of its members, offered the following resolution:

"He (the Governor) shall receive no fees or perquisites or extra compensation for the performance of his duties connected with his office."

This resolution is shown to have been lost. (Journal of the Constitutional Convention, page 287.) Neither the expression "and no more" following the salary provision, nor the clause which provides "and shall have the use and occupation of the Governor's mansion, fixtures and furniture" could possibly be given the effect of excluding all other kinds of appropriations for the Governor, because the Constitution itself clearly provides in section 48 of article 3 for the payment of all incidental expenses connected with the office of Governor, and with the State government. All this, it seems to 'me, makes the question one of grave doubt as to whether the mention of the use and occupation of the mansion, fixtures and furniture excluded all other perquisites, and amounted to a clear command to the Legislature not to appropriate any similar perquisites, or any perquisites to the Governor, but to restrict him entirely to the salary of $4000 per year.

It is an unbroken rule of authority, and it will not be contended by anyone to the contrary, that the Legislature would have unrestrained power to appropriate all kinds of perquisites to the Governor unless there is a clear command by the Constitution itself for the Legislature to refrain from so doing. Unless there is a plain "thou shall not" in the Constitution the Legislature may act at its own discretion, and according to its own wishes. It occurs to .me that section 5 of article 4 is not such a command. Especially is this true when section 48 of article 3 affirmatively authorizes the Legislature to levy taxes and

impose burdens upon the people "to raise revenue sufficient for the economical administration of the government." This unreservedly commits to the discretion of the Legislature all appropriations which in its opinion the Legislature considers necessary for the economical administration of the government. It is, therefore, a matter of discretion with the Legislature as to what appropriations they will make for the administration of the government, except where the Constitution has specifically provided a limitation upon the exercise of such discretion.

If the Legislature's Act was valid, and directly authorized by the portion of section 48 of article 3, which provides for the payment of "all officers, agents and employees of the State government, and all incidental expenses connected therewith," then it inevitably follows that the other sections of the Constitution relied upon by the defendant in error, and quoted herein, to render the appropriation in question unconstitutional, can not possibly be given effect.

The question then turns upon the legality of the appropriation by the Legislature to cover the incidental expenses complained of. And in considering that question we are brought at once to the consideration of the question as to whether the judiciary, a co-ordinate branch of the government, can revise the discretion once exercised by the Legislature, another co-ordinate branch of the government. Many well recognized authorities hold to the view that the courts have no power to inquire into or revise the decision of the Legislature upon a question where it has exercised its discretion, there being nothing upon the face of the Act passed by them to show their act to be repugnant to some provision of the State Constitution. Upon this question Ruling Case Law, a standard authority, volume 6, section 112, says:

"The constitutionality of a law is not to be determined on a question of fact to be ascertained by the court. If under any possible state of facts an Act would be constitutional, the courts are bound to presume that such facts exist; and, therefore, the courts will not make a separate investigation of the facts, or attempt to decide whether the Legislature has reached a correct conclusion with respect to them."

Also see sections 109, 110 and 111, volume 6, Ruling Case Law. Also see Cyc., volume 8, pages 727, 736, 737 and 738.

To the same effect is the holding of this court in the case of March vs. State, 44 Texas, 79, in which this court, speaking through Mr. Associate Justice Ireland, said:

"It is a principle that has become axiomatic that, when a discretion is confided to any one branch of the government, a decision by that department upon that particular point can not be questioned or revised."

It must also be considered that in passing the appropriations which are attacked the Legislature was compelled to pass upon the facts in order to determine whether the items appropriated were incidental expenses of the Governor or connected with the State government, or whether they were in fact the private expenses of the Governor, and

not connected with him as an officer or with the State government as such.   Can the courts inquire into the facts when the Legislature, a co-ordinate branch of the government, has done so?   And decide the question of fact and take action thereon?   Every person knows that the higher courts may revise questions of fact decided by juries and judges, because this is authorized by the Constitution.   But there is no constitutional provision which authorizes the courts to inquire into and revise the findings of facts by the Legislature.   One can not appeal from an adverse ruling upon the facts by the Legislature, to the courts for redress.   When it is appropriate for the Legislature to consider the facts while passing legislation their finding upon such facts is final.   The rule is well stated by the author of Ruling Case Law, volume 6, section 111, which is as follows:

"On frequent occasions the constitutionality of a statute depends on the existence or non-existence of certain facts.   In view of the presumption in favor of the validity of statutes, it must be supposed that the Legislature had before it when the statute was passed any evidence that was required to enable it to act; and if any special finding of fact was needed in order to warrant the passage of the particular act, the passage of the Act itself is treated as the equivalent of such finding. The validity of legislation which would be necessary or proper under a given state of facts does not depend on the actual existence of the supposed facts.   It is enough if the law-making body may rationally believe such facts to be established.   Under the American system of government by the people through their chosen representatives, practical legislation admits of no other standard of action.   The fact that the finding of the Legislature is in favor of the truth of one side of a matter as to which there is still room for difference of opinion is not material.   What the people believe is for the common welfare must be accepted as tending to promote the common welfare, whether it does in fact or not.   It has been said that any other basis would conflict with the spirit of the Constitution, and would sanction measures opposed to a republican form of government.   As a general rule, therefore, it may be stated that the determination of facts required for the proper enactment of statutes is for the Legislature alone, that the presumption as to the correctness of its findings is conclusive, and that the courts do not have jurisdiction or power to reopen the question or make new findings of fact."

Also see section 84, volume 6, Ruling Case Law, and section 497, volume 2, Lewis' Sutherland Statutory Construction.

But the contention by the defendant in error is, as shown in the quotation herein made from his petition, that the appropriation was made for the purpose of increasing the Governor's salary to a sum in excess of $4000.   Can the purpose, design and motive of the Legislature in passing a bill, or of Governor Colquitt in using the funds appropriated, be inquired into?   Can the courts go behind an Act of the Legislature to inquire into the motives which prompted members

of the Legislature, or the motives which prompted individuals, in instigating such legislation? Undoubtedly they can not. The rule is stated in volume 6, section 110, Ruling Case Law, thus:

"If a statute appears on its face to be constitutional and valid, the courts can not inquire into the motives of the Legislature, or the intention of those who enacted it, except to the extent that these may be disclosed on the face of the Acts, or inferable from their operation."

Also see sections 109 and 111, and see section 497, Lewis' Sutherland Statutory Construction.

Returning to the question whether the appropriation which is attacked is in violation of section 5, article 4, of the Constitution, which covers the salary question, I call attention to the fact that every Legislature which has convened since the adoption of the Constitution, in the passing of appropriation bills, has construed said article of the Constitution as not prohibiting the granting of benefits and perquisites to the Governor of the State. The first Legislature after the adoption of the Constitution appropriated $100 per year for "gas for the Governor's mansion," and a similar appropriation has been carried by every Legislature which has convened since the adoption of the Constitution. The second Legislature which convened after the adoption of the Constitution appropriated $400 per year for gardener; $2000 per year for wood, lights, etc., and $200 contingent fund each year for the mansion. These appropriations in almost the identical language have been carried in every appropriation bill of every Legislature since. In 1881, and in 1883, the Legislature appropriated $500 for each of the two years for "labor to keep the executive mansion and grounds in order, and other contingent expenses." This item has been carried in every appropriation bill of each Legislature since the adoption of the Constitution. In 1884 an appropriation was made for telephones, and that item has been constantly carried in all appropriation bills by subsequent Legislatures. In 1887 $100 was appropriated for water for mansion. That item has uniformly been carried by every Legislature that has convened. During Governor Ross' administration the Legislature appropriated for freight, postage and telegraphing for the Governor's mansion $800 per year, and in addition $300 per year for contingent expenses. During Governor Hogg's administration the Legislature appropriated $125 each year for water and ice for the Governor's mansion; $20 for repairing and tuning the piano, and $300 contingent expense each year. Under Governor Culberson's administration, which was one of the most economical administrations had in Texas, $1000 was appropriated for postage and telegraphing; $3000 for Governor's mansion and furniture, including repairs to mansion and grounds; $1000 for gardener and labor in keeping up grounds; $400 for water and lights for mansion; $600 for housekeeper for mansion; $900 for fuel and lights; $400 contingent expense. The appropriations mentioned, or some such similar appropriations, have been

constantly carried, as asserted by counsel for the plaintiff in error, in every appropriation bill since the Constitution was adopted.

This amounts to a legislative construction of section 5, article 4, of the Constitution, as not prohibiting that character of appropriations for the mansion and grounds. The Legislature so construed it in every session from the time of its adoption by the constitutional convention in 1876 until the present time. The courts of the country uniformly hold that such a legislative construction is of great value in passing upon the constitutionality of a law where the question involved is doubtful. (Lewis' Sutherland Statutory Construction, section 472.) In the case of Trigg v. Pennsylvania, 41 U. S., 539, the United States Supreme Court, speaking through Mr. Justice Storey, said:

"If the question were one of doubtful construction, such long acquiesence in it, such contemporaneous exposition of it, and such extensive and uniform recognition of its validity would in our judgment entitle the question to be considered at rest; unless, indeed, the interpretation of the Constitution is to be delivered over to interminable doubt throughout the whole process of legislation and national operation. Congress, the executive and the judiciary have upon various occasions acted upon this as a reasonable doctrine."

To the same effect was the holding of the United States Supreme Court in the case of United States v. Philbrick, 120 U. S., 52, where it was said:

"A contemporaneous construction of the officers upon whom was imposed the duty of executing these statutes is entitled to great weight, and since it is not clear that that construction was erroneous, it ought not now to be overturned."

But almost, if not quite, the exact question has been passed upon by the Supreme Courts of other States as applied to constitutional provisions to the same substantial effect as section 5, article 4, of our State Constitution. And in each instance the question has been decided by the Supreme Courts of other States contrary to the contention of the defendant in error, Middleton, in this case.

Under the Constitution of Pennsylvania members of the Legislature were only allowed mileage and per diem, *and no more*. In 1887 the dedication ceremonies of the monument to General Grant were held in the city of New York. The Legislature of Pennsylvania, by concurrent resolution, provided that they should attend such celebration in a body. This they did, at the expense of the State, which expense was covered by appropriation from the State Treasury. A suit similar to this one was instituted in which it was contended that the appropriation covering their expenses was unconstitutional in that it constituted additional compensation to the members of the Legislature, in violation of the constitutional provision which, after providing for their mileage and per diem, used the phrase *"and no more."* The Supreme Court of Pennsylvania overruled such contention, and held that such expenses

did not constitute additional compensation, and in passing upon the question it said:

"It is conceded by the learned and able counsel for appellee that the payment of the expenses may not be technically compensation; and yet, by the process of reasoning through which they would have us declare it to be compensation, within the constitutional prohibition, the very ink furnished to Senators and members, and the pens dipped into it in answering the daily inquiries of constituents, would have to be regarded as constitutionally unlawful compensation to them, if paid for by the State." Russ v. Commonwealth, 210 Pa., 544, 1 L. R. A. (N. S ), 409.

A similar question was passed upon by the Supreme Court of Nebraska, in the case of State v. Sheldon, 78 Neb., 552, 111 N. W., 372. Suit was brought to recover for rent for the use and occupation by the Governor of the mansion. The contention there, as here, was that the use and occupation of the Governor's mansion was not authorized by the Constitution which limited the Governor's salary to $2500 per year, and that the effect of his free use of the government's property amounted to an increase in his compensation to the extent of $100 per month, the reasonable value of the rent of said premises. The Supreme Court of Nebraska held that the Governor was not liable, and that the use and occupation of the mansion was not an increase in his compensation.

The Constitution of the United States fixes the President's salary, as follows:

"The President shall, at stated times, receive for his services, a compensation, which shall neither be increased nor diminished during the period for which he shall have been elected, and he shall not receive within that period any other emolument from the United States, or any of them."

Yet it is well known that Congress has each year appropriated thousands upon thousands of dollars for expenses of the President of the nature and kind here attacked, and other such expenses of a different kind taking a much wider range in the kind and quality of expenses appropriated than do the appropriations here attacked. As is well known, the Congress of the United States has at all times been composed in a large measure of great constitutional lawyers. Their action in making such appropriations covering so long a period of time amounts to a legislative construction of the Federal Constitution that to allow such expenses does not increase the President's compensation or provide him with "other emolument."

It seems to me that the most that could be claimed on the question of the unconstitutionality of the appropriation bill is, that its constitutionality is in doubt. That being true, the legislative construction by Congress of a similar provision in the Federal Constitution, the legislative construction in Texas for more than forty years by the Texas Legislatures, together with the Supreme Court decisions from

Nebraska and Pennsylvania upon substantially the same question as is involved here, should be sufficient to refute the charge made in the petition by Middleton, to the effect that the appropriations here attacked were made by the Legislature in "an attempt to increase the compensation of the Governor of Texas." And since no evidence at all was introduced to prove such dishonest purpose either upon the part of the Legislature which made the appropriation, or upon the part of Governor Colquitt, who accepted its benefits, I am unable, with the lights before me, to reach the conclusion that such purpose and design in fact existed upon the part of either. Neither do I believe that any court has the right to inquire into the evil motives and purposes of the Legislature I think the courts are restricted to the construction of the Act itself, and to the language employed in it. I, therefore, conclude that the writ should be granted and the case heard upon full oral argument upon submission, to the end that the doubts involved may be resolved with justice to the litigants.

Opinion delivered March 28, 1917.

### CONCURRING OPINION ON MOTION FOR REHEARING.

MR. JUSTICE HAWKINS delivered the following opinion concurring in the overruling of applicant's motion for rehearing.

Speaking for myself only, I think that the motion for rehearing should be overruled, for the reasons stated in my concurring opinion in this case, filed February 20, 1917. 191 S. W., 1138.

Having carefully considered said motion during the preparation of said opinion, it was not my purpose to write again in the case; but several features of the opinion of this date by Mr. Justice Yantis, dissenting from the order of this court overruling said motion, impel me to say what follows.

Because I did not consider section 48 of article 3 of our State Constitution applicable, I did not, in my former opinion, discuss that section; but now that one member of this court has pointed to section 48, alone, as affording constitutional sanction for such appropriations and for such expenses, I feel called upon to say now, specifically, that in that section I can find nothing whatever which conflicts with any of my views or conclusions as set out in my said former opinion.

Section 48 relates, primarily, to the raising of State revenues, and only in a secondary and inferential way does it relate to the making of appropriations or to the incurring or payment of expenses of any kind. The making of such appropriations from the State Treasury and the manner of incurring expenses upon the faith and credit of the State, and payment thereof, are treated, specifically and directly, by other sections of our Constitution, as pointed out by me in said former opinion, and to such other sections we must turn to find express restrictions upon the power of the Legislature to make such appropriations and upon the power to incur or pay such expenses. It is but

a platitude to say that those express and specific and unambiguous restrictions, as far as they go, control all implications of section 48 as to such appropriations and such expenses.

Consequently, the right of the Legislature to appropriate revenues "sufficient for the economical administration of the government" and for the payment of "all officers, agents, and employees of the State government, and all incidental expenses connected therewith," which right is recognized, by implication, in section 48, clearly is subordinate to, and, very plainly, is controlled by, such other more direct and more specific constitutional provisions, such, for instance, as section 5 of article 4, which carries a very obvious limitation upon, not merely the "salary" but upon the entire "compensation," of the Governor, and section 44 of article 3, which certainly inhibits all expenditures not provided for "by pre-existing law," all as pointed out in my former opinion.

Moreover, the right of the Legislature to make appropriations to cover whatever properly and fairly may be considered and treated as "incidentals," as that word stands in section 48, which right, as hereinabove indicated, is declared only inferentially, by the section, is, in the present case, a purely abstract and merely academic matter, because none of the appropriations or expenses in controversy falls within such designated class, as being "incidental" to the Governor's official duties, and none of said expenses was authorized by any valid pre-existing law. That much is clear as matters of law. My views upon those features of this case are set out at length in said former opinion. I refer to them here solely for the purpose of developing, very briefly, my idea of the meaning and legal effect of section 48, which was not there discussed.

With the exception of his views as to section 48 of article 3, said dissenting opinion is, in substance, but little more than a reflex of said motion, and I will not attempt to answer it in detail; however, I trust that I may be pardoned for the following observations:

A sufficient reason for voting down, in the constitutional convention the quoted resolution denying to the Governor "fees or perquisites or extra compensation" probably was that, already, the subject had been exhausted in section 5 of article 4. Evidently said dissenting opinion was not then anticipated. The logic of my distinguished dissenting associate leads, inevitably, to the conclusion that the Legislature is entirely free to provide by law, for the Governor, "fees" and "perquisites," if not "extra compensation" in the widest possible range and in unlimited amounts, and is also free to make like unrestricted appropriations for any and all other officers, agents and employees of the State government. At that view of the legal effect of our Constitution its framers doubtless would now stand aghast. I do.

Upon that point, as related to appropriations and expenses for the Governor, such as those here in controversy, a side light is found in section 22 of article 4 of our Constitution which provides, with refer-

ence to the Attorney General: "He shall receive for his services an annual salary of two thousand dollars, and no more, besides such fees as may be prescribed by law; provided, that the fees which he may receive shall not amount to more than two thousand dollars annually." The contemporaneous omission from section 5 of article 4, prescribing the "compensation" of the Governor, of any provision for "fees" for the Chief Executive, is very significant, and indicates, unmistakably and sufficiently, an intent to prohibit the Legislature from granting or allowing to the Governor any such fees, just as the provision in section 5 of article 4 that he "shall have the use and occupation of the Governor's mansion, fixtures and furniture" indicates an intent that he shall not be allowed any other "perquisites" whatever.

I decline to be bound by the decision of the Supreme Court of Nebraska in State v. Sheldon, 78 Neb., 552, 111 N. W., 372, because I regard it as clearly erroneous, and the same remark applies to the decision of the Pennsylvania Supreme Court in Russ v. Commonwealth, 210 Pa., 544, 1 L. R. A. (N. S.), 409.

In the matter of appropriations the Constitution of Pennsylvania is far less restrictive than ours.

The quoted provision of the Constitution of the United States relative to the "compensation" of the President fixes no limit in the amount thereof; and if the stated appropriations thereunder have ever been tested in the courts that fact has not been pointed out.

The actions of the District Court, and of the Court of Civil Appeals, and of the Supreme Court, in this case, involve no judicial review of, or control, or attempt or purpose to control, executive or legislative discretion in any matter in which those departments are either authorized or permitted by our Constitution to act, to the extent of incurring and paying the expenses in controversy, and such judicial action does not impugn the motives of any member of either of those departments. Such judicial action is entirely consistent with the usual presumption that all members of those departments who have acted in the premises did so in good faith and upon the belief that said appropriations and expenses were not obnoxious to our Constitution, but valid in all respects, just as the dissenting member of this court now acts and believes. The issues presented in this case do not involve the motives of anyone; they are questions of law, arising upon uncontroverted facts, tested by our State Constitution. In any event the issues should remain unclouded.

Opinion delivered March 28, 1917.

*Motion for rehearing overruled.*