William KIRBY, et al., Appellants,

v.

EDGEWOOD INDEPENDENT SCHOOL DISTRICT, et al., Appellees.

No. 3–87–190–CV.

Court of Appeals of Texas, Austin.

Dec. 14, 1988.

Rehearing Denied Jan. 4, 1989.

---

Jim Turner, Timothy L. Hall, Hughes & Luce, Austin, for Eanes Independent School Dist., et al.

Robert E. Luna, Earl Luna, Mary Milford, Dallas, for Andrews Independent School Dist., et al.

Robert F. Brown, Hutchinson, Price, Boyle & Brooks, Dallas, James W. Deatherage, Power, Deatherage, Tharp & Blankenship, Irving, for Irving Independent School Dist.

Jim Mattox, Atty. Gen., Kevin T. O'Hanlon, Asst. Atty. Gen., Austin, for William N. Kirby, Texas Com'r of Educ., Texas State Bd. of Educ., William Clements, Governor of Texas, Robert Bullock, Comptroller of Texas, Jim Mattox, Atty. Gen. of Texas.

Albert H. Kauffman, Mexican American Legal Defense and Educ. Fund, San Antonio, for Edgewood Independent School Dist., et al.

David R. Richards, Richards, Wiseman & Durst, Richard E. Gray, III, Gray & Becker, Austin, for Alvarado Independent School Dist., et al.

Before SHANNON, C.J., and GAMMAGE and ABOUSSIE, JJ.

SHANNON, Chief Justice.

Appellee school districts, parents, and students filed suit in the district court of Travis County seeking a declaration that the Texas school financing system, Tex. Educ.Code § 16.001, *et seq.*, is in violation of the Texas Constitution.[1] After a bench trial, the district court rendered judgment to that effect. This Court will reverse the judgment and here render judgment that appellees take nothing.

■ By its judgment the district court declared the funding scheme in violation of Tex. Const. art. I, § 3 (equal rights), § 19 (due course of law)[2] and art. VII, § 1 (efficient school system). The district court concluded that education is a "fundamental right"; that wealth is a "suspect classification" in the school finance context; that the existing funding scheme is unconstitutionally "inefficient"; and that the Texas Constitution demands "fiscal neutrality" in public school funding, *i.e.*, the level of expenditures per pupil in any district may not vary according to the property wealth of that district. Finally, the district court enjoined the relevant state officials from enforcing the challenged statutes but

---

1. Appellants are the Commissioner of Education, the State Board of Education, other State officials and a number of school districts.

2. There is no mention of the due course of law provision in the pleadings or conclusions of law, and such claim was not tried by consent. Accordingly, the issue of whether the existing school funding scheme violates the due course of law provision is not a basis for the district court's judgment and is also not before this Court.

"stayed" the injunction until September 1, 1989.

The district court filed many findings of fact, a distillation of which follows. There are 1,061 school districts in Texas with about three million students in attendance. Under the existing school finance system, the state and the school districts share the cost of school operations but not the cost of facilities, which is borne entirely by the districts. Of total education costs, the State provides approximately forty-two percent, the school districts approximately fifty percent (derived from local property taxes), with the remainder coming from various sources, including federal funds. Because taxable property wealth varies from district to district, school districts' abilities to generate revenues vary and, as one would expect, there are disparities in the level of expenditures per student between the wealthy and the less wealthy school districts. Wealthier school districts are able to provide their students better physical facilities, more extensive curriculum, larger libraries and better trained teachers than are the less wealthy districts.

The local school district tax rates also vary widely from district to district. The less wealthy districts frequently must set a higher than average tax rate to achieve the necessary revenue to meet minimum educational standards.

The State, through its Foundation School Program, offsets to a degree the inability of the less wealthy school districts to generate revenues. The purpose of the program is to insure that each district has the necessary funds to provide each of its students at least a basic education. Under the program, the amount of state aid received by any given district is "equalized" according to a complex formula, so that low property wealth districts generally receive substantially more state aid than do the high property wealth districts.

By several points of error, appellants challenge the district court's overall conclusion that the State's school funding scheme is in violation of Tex. Const. art. I, § 3. Article I, § 3 provides in pertinent part:

All free men, when they form a social compact, have equal rights....

More specifically, appellants attack the district court's application of the "strict scrutiny" standard in evaluating the school finance system because, appellants assert, education is not a "fundamental right" and wealth is not a "suspect classification."

In an equal protection or equal rights analysis, the appellate court, of necessity, must begin by recognizing the applicable standard of judicial review.[3] If the questioned statute infringes upon a "fundamental right" or creates an inherently "suspect classification," the statute will be subjected to strict judicial scrutiny. Such scrutiny requires the state to establish a compelling interest in its enactment. To discharge such a burden the state must demonstrate that its purpose or interest is both constitutionally permissible and compelling, and that its use of the classification is necessary to the accomplishment of its purpose. *Spring Branch I.S.D. v. Stamos*, 695 S.W. 2d 556 (Tex.1985); *Hernandez v. Houston Independent School District*, 558 S.W.2d 121 (Tex.Civ.App.1977, writ ref'd n.r.e.).[4]

3. Appellees point out, correctly, that subject to meeting to federal standards as well, the courts of this State are at liberty to fashion their own tests to determine whether a Texas statute is valid under the Texas constitution. *Whitworth v. Bynum*, 699 S.W.2d 194, 196 (Tex.1985). Appellees then urge this Court to disregard federal precedent in resolving this appeal. Appellees' position ignores the fact that this cause was pleaded, tried, and judgment rendered pursuant to the equal protection analysis evolved by the opinions of the federal courts: a statute is subjected to strict judicial scrutiny if it infringes upon a fundamental right or if it creates a suspect classification. Moreover, this Court notes that when advantageous to their position, appellees do not hesitate to seize upon and urge federal equal protection precedent.

More important, in several opinions our courts have employed the federal equal protection analysis in considering the "equal rights" provision of the Texas Constitution. *Spring Branch I.S.D. v. Stamos*, 695 S.W.2d 556 (Tex.1985); *Hernandez v. Houston Independent School District*, 558 S.W.2d 121 (Tex.Civ.App.1977, writ ref'd n.r.e.). Because the Texas courts have utilized the federal analysis, federal precedent is highly persuasive.

4. The precise holding in *Hernandez*, that the State need not provide a tuition-free education to illegal alien children, was overruled by *Plyler*

On the other hand, if the statute does not collide with a fundamental right or create a suspect classification, the statute is accorded a presumption of constitutionality. The presumption may not be disturbed unless the enactment rests upon grounds wholly irrelevant to the achievement of a legitimate state objective. *Whitworth v. Bynum,* 699 S.W.2d 194, 197 (Tex.1985).

In support of the district court's conclusion that education is a fundamental right for purposes of equal protection analysis, appellees advance the premises that (1) education is vitally important and (2) education is specifically referred to in the Constitution of Texas, particularly Tex. Const. art. VII, § 1. No one, of course, disputes appellees' premise that education is important and that public education has long commanded a central role in the affairs of this State. Importance of a state service and its role in state affairs, however, is not controlling in ascertaining whether fundamental constitutional rights are involved. *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 30–31, 93 S.Ct. 1278, 1295, 36 L.Ed.2d 16 (1973).

Appellees' second premise is grounded upon a statement in *San Antonio Independent School Dist. v. Rodriguez, supra,* to the effect that for purposes of federal equal protection analysis one should determine "whether there is a right to education explicitly or implicitly guaranteed by the Constitution." Because public education is mentioned in the Texas Constitution, appellees insist that the right to an education is a fundamental right. More specifically, appellees rely upon Tex. Const. art. VII, § 1 which provides:

§ 1. Support and maintenance of system of public free schools.

Sec. 1. A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable

provision for the support and maintenance of an efficient system of public free schools.

Appellees' argument, embraced by the district court, ignores the difference between the Constitution of the United States and that of Texas. Unlike the United States Constitution, which is a document delegating limited authority and power, the Texas Constitution addresses a great number of subjects, the large majority of which are not fundamental rights. Indeed, the Texas Constitution contains many provisions that are usually the subject for legislation. For example, the Constitution provides for the establishment of county poor houses and farms, art. XVI, § 8; defines usury, art. XVI, § 11; provides for local option elections, art. XVI, § 20; provides for mechanic liens, art. XVI, § 37, and for water storage facilities, art. III, § 49–d. Yet, no one would seriously propose that one has a fundamental right, for example, to a water storage facility or a mechanics lien although the provision for each finds its place in the Texas Constitution. This Court, of course, does not suggest that these provisions are on an equal footing with those provisions which concern education, but the placement in the Constitution of such legislative-type provisions points up the weakness in appellees' argument, *i.e.,* that because a subject is contained in the Texas Constitution it must be a fundamental right.

Appellees point out, however, that the Texas Constitution not only refers to education, but also states that education is "essential to the preservation of the liberties and rights of the people." Because the Texas Constitution states that education is "essential" to the basic liberties, appellees argue education must be a fundamental right. Without a system of education, appellees reason, the people would not be able to meaningfully exercise liberties such as freedom of speech and the right to vote.[5]

*v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).

**5.** We do not understand that the district court concluded that the Texas educational system fails to provide each child with a basic education sufficient to meaningfully exercise his basic liberties. Instead, the district court found that in many school districts, because of inferior resources, the educational system fails to provide many children with an "adequate" education. The district court defined an "adequate

Appellees' analysis has been termed the "nexus" theory in legal writings.

The Supreme Court of the United States concluded that education is not a fundamental right even though its provision by the state may be necessary for its citizens to exercise meaningfully their basic liberties. *San Antonio Independent School Dist. v. Rodriguez, supra.* The Court reasoned that the "nexus" analysis lacked logical limitation; for example, that there is no fundamental right to food and shelter although the existence of each is essential for the exercise of recognized fundamental rights. In this connection, the court stated:

> Furthermore, the logical limitations on appellees' nexus theory are difficult to perceive. How, for instance, is education to be distinguished from the significant personal interests in the basics of decent food and shelter? Empirical examination might well buttress an assumption that the ill-fed, ill-clothed, and ill-housed are among the most ineffective participants in the political process, and that they derive the least enjoyment from the benefits of the First Amendment. If so, appellees' thesis would cast serious doubt on the authority of *Dandridge v. Williams* ... [397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)] and *Lindsey v. Normet* [405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972)].

*Rodriguez,* 411 U.S. at 37, 93 S.Ct. at 1299.

Education, without doubt, occupies an important place in the maintenance of the State's basic institutions and is certainly a primary vehicle for transmitting the values upon which our society rests. *See Plyler v. Doe,* 457 U.S. 202, 221, 102 S.Ct. 2382, 2396, 72 L.Ed.2d 786 (1982). The issue here to be resolved, however, is whether education is included in the limited category of fundamental rights that reach constitutional dimensions. Initially, one might conclude that the two issues are the same; that because education is important, it should be a fundamental right. In ordinary usage, that conclusion is probably cor-

rect. In law, however, the term "fundamental right" has a special, narrow, technical meaning. This Court, of course, must employ the term's legal meaning.

In discussing the narrow, technical meaning, the Supreme Court of Texas has plainly stated that "fundamental rights have their genesis in the express and implied *protections* of *personal liberty* recognized in federal and state constitutions" such as the right to free speech or free exercise of religion. *Spring Branch I.S.D. v. Stamos,* 695 S.W.2d at 559 (Emphasis added). The term "fundamental right" refers to a limitation upon the exercise of governmental power; it does not imply an affirmative obligation upon government to insure that all persons have the financial resources available to exercise their liberty or fundamental rights. The issue is one of *personal liberty,* a broad term, but one that necessarily contemplates that some things must fall outside the scope of "liberty" and hence *outside* the scope of "fundamental rights." *See Board of Regents v. Roth,* 408 U.S. 564, 570–573, 92 S.Ct. 2701, 2705–2707, 33 L.Ed.2d 548 (1972). In the present appeal, there is no suggestion of unwarranted governmental interference with any person's "liberty," of whatever kind, such as the freedom to travel, to choose an occupation, to make family decisions (whether to marry or whether to have children), to worship God as one sees fit, "and generally to enjoy those privileges *long recognized* as essential to the orderly pursuit of happiness by free men." *Roth,* 408 U.S. at 572, 92 S.Ct. at 2706 (Emphasis added).

■ This court concludes that education, although vital, does not rise to the same level as the right to engage in freedom of speech or to exercise religion free of governmental interference, both rights which have long been recognized as fundamental and entitled to protection under both the federal and state constitutions. *Spring Branch I.S.D. v. Stamos,* 695 S.W.2d at 560. In the opinion of this Court, the dis-

education opportunity" as the "education program available to ... the 600,000 students in the state's wealthiest school districts." The district

court apparently concluded that the Texas Constitution guarantees this type of educational opportunity to each child.

trict court erroneously elevated the important state interest of financing educational opportunity into a protected right on the same level with ancient liberties long recognized by the courts as fundamental, such recognized rights which do not depend upon public financial support.

Moreover, this Court in 1977 adopted the federal constitutional analysis as the proper approach to determine the validity of "constitutional right to education" claims under the Texas Constitution. *Hernandez v. Houston Independent School District, supra.* Although the precise holding in that case was overruled in *Plyler, supra,* it was overruled on other grounds, *i.e.,* a claim under the federal constitution. As such, *Hernandez* still requires that the federal analysis be employed to measure state claims. In order to reach its conclusion, the district court disregarded this precedent.

For all of these reasons, the district court erred in concluding that education is a "fundamental" right.

■ The district court erred further in determining that wealth is a suspect classification for purposes of equal protection analysis. The plaintiffs in *Rodriguez* claimed that unequal funding for school districts violated the equal protection rights of students in the less well-funded districts. In rejecting that proposition, the United States Supreme Court wrote:

... [A]ppellees' suit asks this Court to extend its most exacting scrutiny to review a system that allegedly discriminates against a large, diverse, and amorphous class, unified only by the common factor of residence in districts that happen to have less taxable wealth than other districts. The system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.

We thus conclude that the Texas system does not operate to the peculiar disadvantage of any suspect class.

*Rodriguez,* 411 U.S. at 28, 93 S.Ct. at 1293.

Our analysis under the Texas Constitution reaches no different result.

Because the Texas public school finance system neither collides with a fundamental right nor creates a suspect classification, such system is accorded a presumption of constitutionality. Such presumption may not be disturbed unless the public school finance system bears no rational relationship to any legitimate state purpose. *Whitworth v. Bynum, supra; Spring Branch I.S.D. v. Stamos, supra;* and *Hernandez v. Houston Independent School Dist., supra.* Utilizing local property taxation revenues to partly finance free public schools is rationally related to effectuating local control of education. The use of local taxes allows a school district the freedom to devote more funds toward educating its children than are otherwise available in the state-guaranteed minimum amount. It also enables the local citizen greater influence and participation in the decision-making process as to how these local dollars are spent. *Mumme v. Marrs,* 120 Tex. 383, 40 S.W.2d 31 (1931).

Although this Court recognizes that, because of disparities in wealth, the practical effect of the existing finance system can lead to low property-value districts having less fiscal control than wealthier districts, this undesirable result, by itself, cannot invalidate the entire system. The fact that obvious disparities in wealth may promote more local control in some districts than in others does not entirely invalidate the legitimate goal of local participation. A legislative scheme may not be condemned simply because it does not effectuate the state's goals with perfection. *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. at 50–54, 93 S.Ct. at 1305–1307.

Appellants also urge that the present system of school finance is authorized by Tex. Const. art. VII, § 3. This Court agrees. Texas Const. art. VII, § 3, as amended in 1883 and subsequently, provides in relevant part as follows:

One-fourth of the revenue derived from the State occupation taxes and poll tax of one dollar on every inhabitant of the State, between the ages of twenty-one and sixty years, shall be set apart annually for the benefit of the public free schools; ... and it shall be the duty of the State Board of Education to set aside a sufficient amount of the said tax to provide free text books for the use of children attending the public free schools of this State; provided, however, that should the limit of taxation herein named be insufficient the deficit may be met by appropriation from the general funds of the State and *the Legislature may also provide for the formation of school district* [sic] *by general laws; and all such school districts may embrace parts of two or more counties,* and the Legislature shall be authorized to pass laws for the assessment and collection of taxes in all said districts and for the management and control of the public school or schools of such districts, whether such districts are composed of territory wholly within a county or in parts of two or more counties, *and the Legislature may authorize an additional ad valorem tax to be levied and collected within all school districts heretofore formed or hereafter formed, for the further maintenance of public free schools, and for the erection and equipment of school buildings therein; provided that a majority of the qualified property taxpaying voters of the district voting at an election to be held for that purpose, shall vote such tax not to exceed in any one year one ($1.00) dollar on the one hundred dollars valuation of the property subject to taxation in such district, but the limitation upon the amount of school district tax herein authorized shall not apply to incorporated cities or towns constituting separate and independent school districts, nor to independent or common school districts created by general or special law.*

(Emphasis added). *See also* Tex. Const. art. XI, § 10 (repealed 1969); *Shepherd v. San Jacinto Jr. Coll. Dist.*, 363 S.W.2d 742 (Tex.1963); 2 G. Braden (ed.), *The Consti-* *tution of the State of Texas: An Annotated and Comparative Analysis,* 511–520 (1977).

The district court concluded that the provisions of art. VII, § 3 are permissive in nature and merely allow the legislature to create school districts with the power to tax as but one means of providing public education. The district court opined, finally, that nothing in the language of art. VII, § 3 or its history requires a finding that the present system of school finance is constitutional.

The proper guiding principle in the construction of a constitution is to give effect to the intent of the voters who adopted it. *Cox v. Robison,* 105 Tex. 426, 150 S.W. 1149, 1151 (1912). A state constitution is not a grant of power but instead it operates solely as a limitation of power. *Watts v. Mann,* 187 S.W.2d 917, 923 (Tex.Civ.App. 1945, writ ref'd). All power which is not limited by the constitution inheres in the people and a legislative act is valid when the constitution contains no prohibition against it. *Id.* A general provision in the constitution must yield to a specific provision, *San Antonio & A.P. Ry. Co. v. State,* 128 Tex. 33, 95 S.W.2d 680, 686 (1936), or to another provision adopted later in time. *State v. Brownson,* 94 Tex. 436, 61 S.W. 114, 115 (1901). The wisdom of a constitutional provision cannot be questioned by the courts. *Cramer v. Sheppard,* 140 Tex. 271, 167 S.W.2d 147, 154 (1942). If the meaning of the language of the constitutional provision is plain, it must be given effect without regard to the consequences. *Id.* A statute is presumed constitutional and will not be declared unconstitutional unless some provision of the constitution can be cited plainly showing its invalidity. *Tex. Nat. Guard Armory Bd. v. McGraw,* 132 Tex. 613, 126 S.W.2d 627, 634 (1939). Our duty, then, is to examine the words of the constitution and intent of the voters to determine whether a reason exists to defeat the statute's presumption of validity. *Cox, supra; McGraw, supra.*

One need not be a student of history to know of the events leading to the Constitutional Convention of 1875. From 1865 to

1873, the people of this state were governed by a group of Union supporters and outsiders, a rule imposed and maintained by military might. Ramsdell, *Reconstruction in Texas* (1910). The Reconstruction Constitution of 1869 set up a strong centralized education system providing for free compulsory education with generous tax support. Eby, *The Development of Education in Texas* 158 (1925). Pursuant to that Constitution, "[t]he law of 1871 set up the most imperial system of education known to any American state. It was organized along military lines and assumed absolute authority over the training of the children." *Id.* at 159. Under the law of 1871 the state board of education was empowered to act in place of the legislature in school affairs. *Id.* One feature repugnant to most Texans was a district tax of one percent for building and maintaining school houses in the district, *Id.* at 163; the tax was levied by five citizens appointed to the district board of directors. *Id.* at 160–161.

Opposition to the new school system was immediate, vigorous, and widespread. For example, a taxpayers' convention convened in Austin resulted in a proclamation advising the citizens not to pay the tax. *Id.* at 163. The people had no role, "but to pay the taxes for the support of the system and obediently to send their children to school ... A system more foreign to the sentiments of the people of Texas could not have been devised." *Id.* at 161. Texans, by and large, ignored the new school laws.

After a majority of the people were enfranchised and regained control of state government, a convention was assembled in 1875 to draft a new constitution. No subject at the convention created more agitation than that of education. *Id.* at 169. In reaction to the education provisions of the Reconstruction Constitution and laws, there was considerable opposition in the convention to public education in any form. After much debate, the convention adopted the article on education which "fell far short of meeting the real needs of the times. In its intense hatred of the radical

school system the convention blindly wrecked the entire [radical school] organization, destroying the features which were good together with those which were bad." *Id.* at 170.

In response to the radical regime's extravagance in taxing and spending, the drafters of the Constitution of 1876 embedded that document with inhibitions against the exercise of the taxing power and the expenditures of public money. "The farmers of Texas constituted a large proportion of that convention, and, writhing under the exactions and extortions of the state government forced upon them, the pendulum swung from the extreme of riotous and irresponsive expenditure of public money to the extreme of close economy, if not penuriousness." *Terrell v. Middleton,* 187 S.W. 367 (Tex.Civ.App.1916, writ ref'd at 108 Tex. 14, 191 S.W. 1138).

In the exercise of "close economy" and in response to Reconstruction excesses, the drafters of the 1876 Constitution did not provide for local taxation for schools. By 1880, however, there was a change in public sentiment in support of public education. Eby, *supra,* at 193. Such support was reflected in 1883 by the adoption of the amendment to art. VII, § 3. By the adoption of the amendment the voters evidenced their intent that the initiative for the formation and maintenance of school districts be vested in those most directly affected: the local citizenry. The legislature was empowered to establish the method for the creation of school districts so that they might be organized as the need for new districts arose. Within limitations, the property-owning voters within the district could impose upon themselves an ad valorem tax to help maintain the schools in the district. The limitation on the taxing power was not imposed, however, upon the incorporated cities and towns constituting separate and independent school districts, thereby permitting those districts the option to raise greater revenue for the support of their schools.[6]

---

**6.** From early times, the towns in Texas were granted special privileges by the legislature for the conduct and management of their schools.

The towns were permitted to vote taxes for the construction and maintenance of buildings. They formed districts independently of the state

■ In summary, the people intended to set up a school system retaining a significant degree of local control. The scheme of local financing that evolved is not wholly irrelevant to the goal of local control.

The district court also concluded that the present school system was "inefficient" in violation of Tex. Const. art. VII, § 1.

■ That provision does, of course, require that the school system be "efficient," but the provision provides no guidance as to how this or any other court may arrive at a determination of what is efficient or inefficient. Given the enormous complexity of a school system educating three million children, this Court concludes that which is, or is not, "efficient" is essentially a political question not suitable for judicial review.

A rather "patched-up and overly cobbled"[7] system of administration and finance for public education has evolved in this state over the past one hundred years. The system does not provide an ideal education for all students nor a completely fair distribution of tax benefits and burdens among all of the school patrons. Nevertheless, under our system of government, efforts to achieve those ideals come from the people through constitutional amendments and legislative enactments and not through judgments of courts.

The opinion and judgment of this Court should not be viewed as an affirmation that the present school financing system is desirable or that it should continue without change; rather, our conclusion is solely that the system is not in violation of the Constitution of Texas.

The judgment is reversed and judgment is here rendered that appellees take nothing.

rules, while at the same time they received the state per capita allotment for their children. These privileges were reaffirmed by the Constitution of 1876 and by subsequent laws. Incorporated towns had the privilege of voting on the question of assuming control of their own schools as independent districts and the question of how large a tax the people desired to pay for this purpose. They could also choose the form of government, whether the schools

should be managed by the city council or by a board of trustees appointed for that purpose. With great rapidity the towns availed themselves of these privileges, especially after 1880. Eby, *supra*, at 178.

7. This Court has borrowed the quoted phrase from Justice Norvell's opinion in *Shepherd v. San Jacinto Jr. Coll. Dist.*, 363 S.W.2d at 744.

GAMMAGE, Justice, dissenting.

I respectfully dissent.

The Texas Constitution imposes on the State the burden of suitably providing for public education. For purposes of implementation, and as an alternative to a unified and centralized system, the Constitution permits the legislature to create districts and allows local taxation for support of the schools within a district. Nowhere, however, does the Constitution permit the creation or adoption of any school system other than one which is efficient and which comports with the requirements of equal rights under the law. The adequacy of a child's education in a competitive, free-market economic and political system such as ours is relative; it is a function of what *other* children are getting. A program of instruction available to one child cannot truly be deemed adequate or efficient if other children are afforded a better educational program and are thereby consistently advantaged in the lifelong competition for money, status, and political influence.

I

The trial court's findings of fact, and the sufficiency of the evidence supporting them, are undisputed. Among the many findings not articulated by the majority are the following:

The wealthiest school district in Texas has over $14,000,000 of property wealth per student, while the poorest district has approximately $20,000 of property wealth per student. The one million students in school districts at the upper range of property wealth have more than two and one-half times as much taxable property wealth to support their schools than do the one million students in the poorer districts.

The 300,000 students in the lowest-wealth schools have less than three percent of State property wealth to support their education, while the 300,000 students in the highest-wealth schools have over twenty-five percent of State property wealth to support their education.

In the 1985–86 school year, due to great disparities in district property wealth, spending per student varied between districts from $2,112 to $19,333. The 600,000 students in the wealthiest districts had two-thirds more spent on their education than the 600,000 students in the poorest districts.

Because of the wide variations in school district wealth, there are vastly differing burdens imposed upon district taxpayers to support education. In the poorest districts, taxpayers must pay more than twenty cents per one hundred dollars valuation to raise one hundred dollars per student; in the wealthiest districts taxpayers need pay less than two cents per one hundred dollars valuation to raise one hundred dollars per student.

Greater financial support enables wealthy school districts to provide much broader and better educational experiences for their students, including such things as better facilities, more extensive curricula and more co-curricular activities, enhanced support through additional training materials and technology, better libraries and library professionals, additional curriculum- and staff-development specialists and teacher aides, more extensive counseling services, special programs to combat dropouts, parenting programs to involve the family in the student's educational experience, lower pupil-teacher ratios, and the ability to attract and retain better teachers and administrators.

The educational preparation of over one-third of the State's population is inadequate. One-third of the school districts do not meet the State's standards for maximum class size, and the great majority of these are low wealth districts. The great majority of school districts not fully accredited because of inability to meet State standards are low wealth districts.

The Foundation School Program does not guarantee each eligible student a basic instructional program suitable to his or her educational needs, and students in low wealth districts do not have an equal opportunity to obtain instruction under the State's requirements.

The poorer districts cannot afford to and do not provide as high quality facilities as the wealthier districts, negatively affecting the educational opportunity of children in those districts.

There is a pattern of heavy concentration of families below poverty level in the poorer districts as compared to the wealthier districts, and an even greater concentration of both low-income families and students in the very poorest districts. Furthermore, while in 1980 twenty-one percent of the State's population was Mexican–American, eighty-four percent of the population in the poorest districts was Mexican–American; and it is significantly more expensive to provide equal educational opportunity to low-income and minority children than to educate higher income and non-minority children.

Forty-five percent of Hispanic ninth grade students drop out of school before graduation, while thirty-four percent of Blacks and twenty-seven percent of Whites do so. Nearly half of Hispanic dropouts complete less than ninth grade when they discontinue schooling, compared to eighteen percent of Black and White dropouts.

The Texas public school finance system continues to have a negative impact on the education of students in low wealth districts in terms of their ability to learn, to master basic skills, to acquire salable skills, and their quality of life.

In the creation and development of school district boundaries, the legislature did not follow any rational or articulated policy. Neither in their creation nor in their perpetuation has an effort been made to equalize the districts' local tax bases. There is no underlying rationale in the boundaries of many school districts, and many are pure tax havens.

## II

Texas Const. art. I, § 3 provides:

*All* free men, when they form a social compact, *have equal rights, and no man, or set of men, is entitled to exclusive separate public* emoluments, or *privileges*, but in consideration of public services. (emphasis added)

Texas Const. art. I, § 3a provides:

Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin. This amendment is self-operative.

Texas Const. art. VII, § 1 provides:

A general diffusion of knowledge *being essential to the preservation of the liberties and rights of the people*, it shall be the *duty of the Legislature* of the State to establish and make *suitable* provisions for the support and maintenance of an *efficient* system of public free schools. (emphasis added)

Texas Const. art. VII, § 3, provides:

One-fourth of the revenue derived from the State occupation taxes and poll tax of one dollar on every inhabitant of the State, between the ages of twenty-one and sixty years, shall be set apart annually for the benefit of the public free schools; and in addition thereto, there shall be levied and collected an annual ad valorem State tax of such an amount not to exceed thirty-five cents on the one hundred ($100.00) dollars valuation, as with the available school fund arising from all other sources, will be sufficient to maintain and support the public schools of this State for a period of not less than six months in each year, and it shall be the duty of the State Board of Education to set aside a sufficient amount of the said tax to provide free text books for the use of children attending the public free schools of this State; provided, however, that should the limit of taxation herein named be insufficient the deficit *may* be met by appropriation from the general funds of the State and *the Legislature may also provide for the formation of school district[s] by general law;* and all such school districts *may* embrace parts of two or more counties, and *the Legislature shall be authorized to pass laws for the assessment and collection of taxes in all said districts and for the management and control of the public school or schools of such districts*, whether such districts are composed of territory wholly within a county or in parts of two or more counties, *and the Legislature may authorize an additional ad valorem tax to be levied and collected within all school districts* heretofore formed or hereafter formed, *for* the further *maintenance* of public free schools, *and* for the *erection and equipment of school buildings* therein; provided that a majority of the qualified property taxpaying voters of the district voting at an election to be held for that purpose, shall vote such tax not to exceed in any one year one ($1.00) dollar on the one hundred dollars valuation of the property subject to taxation in such district, but the limitation upon the amount of school district tax herein *authorized* shall not apply to incorporated cities or towns constituting separate and independent school districts, nor to independent or common school districts created by general or special law. (emphasis added)

The district court held that education is a "fundamental right" necessitating strict judicial scrutiny of the funding scheme under article I, §§ 3 and 3a; that wealth is a "suspect classification" in the school finance context, also necessitating strict scrutiny; that article I, §§ 3 and 3a, demands "fiscal neutrality" in school funding (expenditures per pupil for instruction and facilities in any district may not be a function of wealth other than the wealth of the State as a whole); and that the existing funding scheme is unconstitutionally "inefficient."

## III

The legislature is, of course, free to determine the "methods, restrictions, and regulations" necessary to administer public schools "so long as that determination is not so arbitrary as to violate the constitutional rights of Texas' citizens." *Spring*

*Branch I.S.D. v. Stamos*, 695 S.W.2d 556, 559 (Tex.1985).

The majority opinion is correct in its observation that the United States Constitution and that of Texas are different, in that the Texas charter addresses a number of normally-legislative matters of a non-fundamental nature, but the opinion fails to observe that none of these matters is perceived, as is education, as "being essential to the preservation of the liberties and rights of the people," nor are they couched in constitutional language lending itself to such treatment.

### A

The majority relies on *San Antonio I.S. D. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (wherein a five-judge majority of the United States Supreme Court, in construing the *federal* Constitution, held education not to be a fundamental right under the Fourteenth Amendment) for its conclusion that education is not a fundamental right; and further reasons, based on *Rodriguez*, that because food and shelter are essential to the exercise of recognized fundamental rights, a right to them must also be fundamental if education is determined to be so under the "nexus" theory. Such reasoning fails to recognize that the Court in *Rodriguez* was relying on the *federal* Constitution, which includes no explicit provision for education. The claim before us relies instead on the *Texas* Constitution, which *does* include such a provision, *explicitly* recognizes that education is indispensable to the meaningful exercise of other fundamental liberties and rights, and *mandates* the legislature to make "suitable" provision for an "efficient" education system.

Furthermore, the fact that a fundamental right may not be enumerated in the Bill of Rights of either our federal or state constitutions is certainly no impediment to its existence. *People v. Belous*, 71 Cal.2d 954, 80 Cal.Rptr. 354, 458 P.2d 194 (1969), *cert. denied*, 397 U.S. 915, 90 S.Ct. 920, 25 L.Ed.2d 96 (1970). "Certain unarticulated rights are implicit in enumerated guarantees.... [and] fundamental rights, even though not expressly guaranteed, have been recognized ... as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579–80, 100 S.Ct. 2814, 2828–29, 65 L.Ed.2d 973 (1980). Texas Courts have repeatedly protected fundamental interests despite their lack of specific textual bases in our State Constitution. *See, e.g., Texas State Emp. Union v. Tex. Dept. of Mental Health & Mental Retardation*, 746 S.W.2d 203 (Tex.1987) (right to privacy); *Holick v. Smith*, 685 S.W.2d 18 (Tex.1985) (parental rights); *Waller v. State*, 68 S.W. 2d 601 (Tex.Civ.App.1934, writ ref'd) (right to pursue an occupation).

Food and shelter are not explicitly provided for in our State Constitution, nor does the State undertake to provide them for all its children. If it did so, a serious question would arise whether the State must do so on a substantially equal basis. But the principle of equal citizenship implicit in article I, §§ 3 and 3a, is not a charter for economic leveling, nor a guarantee that the government will provide the necessities of life. Basic to our tradition of responsible citizenship is, after all, the concept that an individual should provide for himself and his family. It is another matter altogether if the State provides the opportunity and means to acquire these necessities to some, but substantially denies the same means and opportunities to others.

### B

The majority opinion acknowledges that "fundamental rights have their genesis in the express and implied protections of personal liberty recognized in federal and state constitutions," *Spring Branch I.S.D. v. Stamos, supra* at 559, but concludes that government has no affirmative obligation to ensure all persons the financial resources necessary to exercise such rights or liberties. Here, again, the opinion fails to recognize that our State Constitution *explicitly and prominently* imposes just such an obligation on State government with regard to education. The State has undertaken to provide an educational sys-

tem, and is mandated to make that provision "suitable" for the support and maintenance of an "efficient" system *adequate* to preserve other "liberties and rights of the people." The State has, with few exceptions, made that system compulsory and individuals are *not at liberty* to avoid it. Tex.Educ.Code Ann. § 21.032 (1987).

As noted by the United States Supreme Court in *Brown v. Board of Education:*

Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him to adjust normally to his environment. In these days it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. *Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.*

347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954) (emphasis added).

## C

The majority opinion correctly notes that this Court, in *Hernandez v. Houston I.S.D.,* 558 S.W.2d 121 (Tex.Civ.App.1977, writ ref'd n.r.e.), relying on *San Antonio I.S.D. v. Rodriguez, supra,* adopted the federal constitutional analysis in determining the existence of a constitutional right to education, but fails again to note that *Rodriguez* deals only with the federal Constitution. Moreover, *Hernandez* was decided without separate consideration of the explicit provisions in the Texas Constitution, nor was the question whether education is a fundamental right under the Texas equal rights provision raised in the *Hernandez* petitioners' application for writ of error to our Supreme Court. The question was not before the Texas Supreme

Court in *Hernandez.* Furthermore, the Dallas Court of Appeals specifically concluded that "[p]ublic education is a fundamental right guaranteed by the Texas constitution," under article VII, even though "public education is not a right guaranteed to individuals by the United States Constitution," citing *Rodriguez,* in *Stout v. Grand Prairie I.S.D.,* 733 S.W.2d 290, 294 (Tex.App.1987, writ ref'd n.r.e.).

The majority opinion does acknowledge that the precise holding in *Hernandez* was overruled by the United States Supreme Court in *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), wherein that Court held Texas' denial of access to free public schools to the children of illegal aliens violated *federal* constitutional guarantees, even though that Constitution provides no fundamental right to education. The Court reasoned in Plyler that

[p]ublic education is not a "right" granted individuals by the [U.S.] Constitution. But neither is it merely some governmental "benefit" indistinguishable from other forms of social welfare legislation. Both the importance of education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child, mark the distinction.... In addition, education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, *education has a fundamental role in maintaining the fabric of our society.* We cannot ignore the significant social costs borne by our Nation when select groups are *denied the means* to absorb the values and skills upon which our social order rests....

\* \* \* \* \* \*

... The stigma of illiteracy will mark them for the rest of their lives. *By denying these children a basic education, we deny them ability* to live within the structure of our civic institutions, and foreclose any realistic possibility that they will contribute in even the smallest way to the progress of our Nation....

\* \* . \* \* \* \*

... It is difficult to understand precisely what the State hopes to achieve by promoting the creation and perpetuation of a subclass of illiterates within our boundaries, surely adding to the problems and costs of unemployment, welfare, and crime. It is thus clear that *whatever savings might be achieved by denying these children an education, they are wholly insubstantial in light of the costs involved to these children,* the State, and the Nation.

*If the State is to deny* a discrete group of innocent children *the free public education* that *it offers to other children* residing within its borders, that *denial must be justified by a showing that it furthers some substantial state interest.* No such showing was made here.

457 U.S. at 221–23, 230, 102 S.Ct. at 2396–97, 2401 (citations omitted).

### IV

The majority opinion again relies on *Rodriguez* for its conclusion that wealth is not a "suspect classification" for purposes of Texas equal rights analysis, but the majority further fails to note that in so finding the United States Supreme Court observed that the record in *Rodriguez* did not include the *undisputed* findings of fact made by the trial court in the case before us today:

Even a cursory examination ... demonstrates that neither of the two distinguishing characteristics of wealth classifications can be found here. First, in support of their charge that the system discriminates against the "poor," appellees have made no effort to demonstrate that it operates to the peculiar disadvantages on any class fairly definable as indigent, or as composed of persons whose incomes are beneath any designated poverty level.... *[T]here is no basis on the record in this case for assuming that the poorest people—defined by reference to any level of absolute impecunity—are concentrated in the poorest districts.*

Second, neither appellees nor the District Court addressed the fact that ... lack of personal resources has not occasioned an absolute deprivation of the desired benefit.... Texas asserts that the Minimum Foundation Program provides an "adequate" education *for all children in the State....* The State repeatedly asserted in its briefs in this Court that it has fulfilled this desire and that it now assures "every child in every school district an adequate education." *No proof was offered* at trial persuasively discrediting or refuting the State's assertion.

For these two reasons—the *absence of any evidence* that the financing system discriminates against any definable category of "poor" people or that it results in the absolute deprivation of education—the disadvantaged class is not susceptible of identification in traditional terms.

\* \* \* \* \* \*

... We hardly need add that this Court's action today is not to be viewed as placing its judicial imprimatur on the status quo. The need is apparent for reform in tax systems which may well have relied too long and too heavily on the local property tax. And certainly innovative thinking as to public education, it methods, and its funding is necessary to assure both a higher level of quality and greater uniformity of opportunity.

411 U.S. at 22–5, 58, 93 S.Ct. at 1290–92, 1309 (emphasis added).

In the case before us, the district court *did* find that poor people are heavily concentrated in the poorer districts. Poor people in the low wealth districts, which constitute the great majority of school districts in Texas not fully accredited because of inability to meet basic minimum state standards, might well be a "suspect classification" because of their financial inability to provide adequate *basic* schooling in our compulsory system. The relative powerlessness of these people to alter their situation through political means indicates strongly that they should be considered a suspect class in the education context. *Plyler v. Doe, supra* 457 U.S. at 220–21, 102 S.Ct. at 2396.

### V

The majority opinion concludes that the drafters of the 1876 Constitution, in the

exercise of "close economy," did not provide for local taxation for schools, but after a subsequent change in public sentiment the amendment to article VII, § 3 was adopted permitting local financing with the intent to set up a school system retaining a significant degree of local control; presumably authorizing the present finance system, warts and all. I disagree.

The primary rule in interpretation of our State Constitution is to ascertain, if possible, and give effect to the intent of the voters who adopted it and gave it life. *Williams v. Castleman,* 112 Tex. 193, 247 S.W. 263, 265 (1922). *Smissen v. State,* 71 Tex. 222, 9 S.W. 112, 116 (1888).

> For as the constitution does not derive its force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people,* and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that was the sense designed to be conveyed.

1 T. Cooley, *Constitutional Limitations* 143 (8th ed. 1927) (emphasis added); *see also* C. Antieau, *Constitutional Construction* § 3.01 (1982).

In determining original intent, we look first to the literal text of the provision in question and attempt to determine how it would have been understood by a voter of ordinary intelligence at the time of its adoption. *Cramer v. Sheppard,* 140 Tex. 271, 167 S.W.2d 147, 152 (1943). Where the terms of the provision are clear, that which the words declare is the meaning of the provision, unless such a literal interpretation would lead to a result not intended by the voters. *See* 16 C.J.S., *Constitutional Law* § 23 at 82 (1984); C. Antieau, *supra,* § 2.04; H. Black, *Construction and Interpretation of the Laws* 15 (1896). When determining whether a certain interpretation should be given the language of a provision, it is proper to consider whether the voters who adopted it would have intended the consequences which must follow

such interpretation. *Koy v. Schneider,* 110 Tex. 369, 218 S.W. 479, 481 (1920). If the text is ambiguous, we try first to ascertain its meaning by examining other parts of the Constitution. *Cox v. Robison,* 105 Tex. 426, 150 S.W. 1149, 1151 (1912).

Constitutional provisions must be interpreted in a manner to give effect to every phrase of the document; no provision ordinarily duplicates another, and provisions should not be interpreted so as to be rendered meaningless. *In the Interest of Mc-Lean,* 725 S.W.2d 696 (Tex.1987); *Hanson v. Jordan,* 145 Tex. 320, 198 S.W.2d 262, 263 (1946).

> One part may qualify another so as to restrict its operation, or apply it otherwise than the natural construction would require if it stood by itself; but one part is not to be allowed to defeat another, if by any reasonable construction the two can be made to stand together.

1 T. Cooley, *supra* at 127–129. In other words, all parts of the Constitution must be interpreted, if possible, so that they are in harmony. *Clapp v. State,* 639 S.W.2d 949, 951 (Tex.Cr.App.1982).

If, after examining the entire document, we are still unsure of the meaning of a particular provision, then we may consider, with hesitation and circumspection, such extraneous factors as the social and political conditions existing at the time of adoption, the apparent evil to be remedied or purpose to be achieved, and (as a last resort) the statements of the drafters. *Mumme v. Marrs,* 120 Tex. 383, 40 S.W.2d 31, 35 (1931); 1 T. Cooley, *supra* at 141–142, 171; 16 C.J.S., *Constitutional Law* § 30 (1984). If a constitutional provision is finally open to more than one interpretation, it must be interpreted equitably so as not to lead to absurdity or unjust discrimination. *Cramer v. Sheppard, supra,* 167 S.W.2d at 155; *Sargeant v. Sargeant,* 118 Tex. 343, 15 S.W.2d 589 (1929).

### A

By its literal terms, article VII, § 3, as amended in 1883 and subsequently, permits the legislature to establish a dual system of State and local funding involving dis-

tricts in rural and urban areas with potentially different tax rates. But nowhere does the provision explicitly repeal the equal rights provision with respect to school finance, and an implied repeal of an earlier provision—especially a provision of the Bill of Rights—is not to be inferred lightly. *Collingsworth County v. Allred,* 120 Tex. 473, 40 S.W.2d 13, 15 (1931) and 16 C.J.S. *Constitutional Law* §§ 29, 40 (1984).

Would the voters who amended article VII, § 3 have interpreted their action as an *implicit* repeal of the equal rights provision with respect to school finance, so as to allow the highly inequitable system existing today? The answer must be "no."

### B

In the late nineteenth century, our State's "population and property wealth were spread relatively evenly across the state." *Rodriguez, supra,* 411 U.S. at 7–8, 93 S.Ct. at 1282–83. There were no great urban areas as there are today and no great concentrations of property wealth. *See* E. Cubberley, *School Funds and Their Apportionment* 21 (1906). In 1880, Texas was a land of small towns (only five with over 10,000 people and none with over 22,000 people) and sparsely settled rural areas. *See* U.S.Dept. of the Interior, *Compendium of the Tenth Census* (June 19, 1880).

> Beginning in 1883, when land was the primary source of wealth, the state granted progressively greater powers of property taxation to local districts to fund education. In an agriculture-centered society, perhaps property accurately measured the ability of local school districts to finance education. Rapid industrialization and a growing economy, however, delineated urban and rural communities, and created new categories and concentrations of property wealth. The cost of education forced property-poor districts to tax their property at higher rates than property-rich districts to raise the minimum legislated revenues. Poor districts struggled to meet minimum financial requirements; wealthier districts supplemented the minimum costs with comparatively little effort by raising tax rates slightly.

Note: *Texas School Finance: The Incompatability of Property Taxation and Quality Education,* 56 Texas L.Rev. 253, 254 (1978).

The voters of that period had no cause to believe that article VII, § 3, while permitting cities and towns to constitute separate school districts, authorized the great disparities existing today in the property wealth and abilities of the districts to raise money per pupil. Furthermore, although the 1883 version of article VII, § 3 limited the tax rate allowed by rural school districts, that limitation was removed by amendment in 1920. *See* G. Braden (ed.), *The Constitution of the State of Texas; An Annotated and Comparative Analysis* 513 (1977). By 1883, "[e]ducation was no longer regarded as a public or private charity but as a *necessary* function of government and the *natural right of every child*." F. Eby, *The Development of Education in Texas,* at 195–6 (1925) (emphasis added). The people's intent remained the same, but local economic circumstances changed.

### C

Article VII, § 3 and article I, §§ 3 and 3a can be harmonized and interpreted equitably. *See Clapp v. State, supra,* 639 S.W. 2d at 951, and *Serrano v. Priest,* 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929, 956 (1977) (*Serrano II*). Read fairly and in the proper historical perspective, article VII, § 3 and article I, §§ 3 and 3a—in conjunction—do not permit disparities between school districts to be substantial unless the State can show a compelling reason for such disparity. Here, the State has shown no compelling reason. If there are to be school districts, and if the legislature chooses to allow educational *ad valorem* taxes to be levied within those districts, the system must be designed to ensure that all such districts have approximately equal abilities to raise and spend revenue on a per pupil basis for support and maintenance of efficient instruction and facilities. The Texas Supreme Court, well before the

development of the "fundamental rights" doctrine or the "suspect classification" analysis, recognized the requirement of equal protection in education—that "all" must be "treated alike"—but permitted disparity, at that time, under the "rational basis" test, which is inapplicable here. *Mumme v. Marrs, supra,* 40 S.W.2d at 36–7.

## D

The majority opinion implies, by its reasoning, that the Texas Constitution places no limit whatsoever on the power of the legislature to establish school district boundaries. Such reasoning dangerously erodes that most precious of political rights—the right to be treated with respect and equality by the government, the right to full and participating citizenship in the state. Article I, §§ 3 and 3a, forbids legislation that degrades or stigmatizes through the use of "suspect classifications," or that seriously impairs individual interests—whether explicitly mentioned in the Constitution or not—that are so critical to full participation in society as to be deemed "fundamental," unless the state can show such legislation is absolutely necessary to attain a compelling State interest. *Spring Branch I.S.D. v. Stamos,* 695 S.W.2d at 559. Education is critical to an individual's participation in today's society; as a constitutional right it is hollow if its possessor is deprived of the opportunity to pursue it on a relatively equal basis with others in our open political system and labor market. The present disparities in the school financing scheme are not necessary to the survival of local control. Local control can be maintained as easily in an equitable system as in the present system. *See Horton v. Meskill,* 172 Conn. 615, 376 A.2d 359, 375–6 (1977).

## VI

Finally, the majority opinion concludes that, while article VII, § 1 requires that the school system provided be "efficient," it provides no guidance for this Court to arrive at a determination of what is efficient or inefficient. Clearly, it is within the discretion of the legislature, in the exercise of its constitutional duty, to determine what is

a "suitable" provision for an "efficient" school system; but it can hardly be argued that a "patched-up and overly cobbled" compulsory system, which denies fully one-third of its students of a substantially equal educational opportunity to attain even the *basic minimum required standards* it imposes, is "efficient." What may be "suitable" is a proper subject for legislative political debate and decision; but the system resulting from that process must be "efficient" enough to preserve protected constitutional rights in accordance with necessary, discernible and manageable legal standards. *Mumme v. Marrs, supra,* 40 S.W.2d at 36–37.

The legislative determination of methods, restrictions, and regulations is final, *except when* so arbitrary as to be *violative of* the *constitutional rights* of the citizen. . . .

\*   \*   \*   \*   \*   \*

. . . Equal protection of laws is secured if the statutes do not subject the individual to arbitrary exercise of the powers of government. It is well settled that legislation is not open to objection *if all who are brought under its influence are treated alike in the same circumstances. . . .*

\*   \*   \*   \*   \*   \*

That . . . *appropriations have a real relationship to* the subject of *equalizing educational opportunities* in the state, and *tend* to *make our system more efficient,* there can be no doubt.

*Id.* (emphasis added).

Upholding the trial court's judgment would not frustrate or embarrass the nonlegal policymaking function of the legislature. *See Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); and Note, *Judicial Control of the Purse–School Finance Litigation in State Courts,* 28 Wayne L.Rev. 1393, 1410–15 (1982).

With regard to the matters discussed, I would affirm the judgment of the trial court.